**SAGE BEACH, A CONDOMINIUM**
**PURCHASE AGREEMENT**
**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.**

In this Agreement, the term "Purchaser" or "Buyer" means or refers to the Purchaser or Purchasers listed below who have signed this Agreement. The word "Seller" means or refers to PMG DRIFTWOOD, LLC, a Florida limited liability company.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Declaration (as defined in Section 1 of this Agreement).

| | | | |
|---|---|---|---|
| Purchaser(s): | **Tulia E Quijano de Hernandez** | | |
| Address: | **6160 SW 114th Street** | | |
| City: | **Miami** | State: | **Florida** |
| Country | | Zip Code: | **33156** |
| Home Phone | | Office Phone: | |
| E-mail address: | | Cell Phone: | **305.495.1542** |
| Tax I.D. No.: | | Fax No: | |

1.   Purchase and Sale. Purchaser agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit ___**2**___ (the "**Unit**"), Unit Type ___**E**___ (the "**Unit**") in SAGE BEACH, A CONDOMINIUM (the "**Condominium**"), created by the Declaration thereof recorded under Instrument Number 113779593 in the Public Records of Broward County, Florida, as amended from time to time (the "Declaration") together with the exclusive use of parking space number_____. The Unit and the Condominium are described in greater detail in the Declaration included in the Prospectus and attached exhibits (the "**Condominium Documents**"). Purchaser acknowledges receipt of the Condominium Documents and all documents listed on the Receipt for Condominium Documents and required by Section 718.503, Florida Statutes, to be furnished by developer to a Purchaser, on or before the date of this Agreement; this paragraph shall not operate in lieu of the Receipt for Condominium Documents.

2.   Payment of the Purchase Price. The total purchase price to be paid by Purchaser ("Purchase Price") for the Unit is $__**1,050,000**__. Purchaser agrees to make payments towards the Purchase Price as follows:

| **Payment** | **Due Date** | | **Amount** |
|---|---|---|---|
| Initial Deposit | 20% Upon execution of this Agreement. | $ | **210,000** |
| Balance | At Closing(March 14,2017) | $ | **840,000** |
| Total Purchase Price | | $ | **1,050,000** |

Each of the deposits set forth above may be made by personal check (subject to clearance), or wire transfer of Federal Funds. The balance due at closing must be paid by wire transfer of federal funds (each a "Deposit" or, collectively, the "Deposits"). All payments must be made in United States funds and all checks must be payable on a bank located in the continental United States. If Purchaser fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Purchaser may be charged a late funding charge equal to interest on such deposit at the rate of _____% per annum from the date due until the date received by Seller and cleared by the bank on which it is drawn.

Purchaser also agrees to pay all closing costs and other sums required to be paid by Purchaser in this Agreement. These charges are subject to change as provided in Section 11 of this Agreement and are explained in more detail in that Section, as are other closing costs which cannot be computed at this time.

3.     How Purchaser Pays. Purchaser understands and agrees that Purchaser will be obligated to pay "all cash" at closing. This Agreement and Purchaser's obligations under this Agreement to purchase the Unit will not depend on whether or not Purchaser qualifies for or obtains a mortgage from any lender. Purchaser will be solely responsible for making Purchaser's own financial arrangements. Seller agrees, however, to cooperate with any lender Purchaser chooses and to coordinate the closing with such lender, if, but only if, such lender meets the Seller's closing schedule and pays Seller the mortgage proceeds of its mortgage at closing in the same manner as specified above with respect to the payment of the balance due at closing.

Although Seller does not have to do so, if Seller agrees to delay the closing until Purchaser's lender is ready, or to wait for funding from Purchaser's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Purchaser agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled the closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance). This late funding charge may be estimated and charged by Seller at closing. Seller's estimate will be adjusted after closing, based on actual funding and clearance dates, upon either Seller's or Purchaser's written request. In the event that Purchaser's lender does not pay Seller all proceeds at closing, Purchaser will not be allowed to take possession of the Unit until Seller actually receives all required funds and they have cleared. The foregoing Section will survive (continue to be effective after) the closing.

4.     Deposits. All of Purchaser's Deposits, as set forth in Section 2 of this Agreement, will be placed in escrow with the "Escrow Agent" (as hereinafter defined), and will be held and disbursed pursuant to Section 501.1375, Florida Statutes. The Deposits shall be paid in the manner and upon the dates provided in Section 2. All Deposits held in escrow shall be deposited FIRST AMERICAN TITLE INSURANCE COMPANY, INC., with offices at 13450 West Sunrise Blvd., Suite 300, Sunrise, Florida 33323 ("Escrow Agent"), in accordance with the escrow agreement contained in the Condominium Documents.

If Purchaser so requests, Purchaser may obtain a receipt for Purchaser's Deposits from the Escrow Agent. Seller shall have the absolute right to change its Escrow Agent at any time prior to Closing as long as Purchaser is given notice of such change, and, if applicable, the Deposits are transferred to the successor escrow agent. Deposits shall be returned and/or released, as the case may be, to Purchaser if Seller defaults or Purchaser is permitted by Seller to properly void this Agreement, or released to Seller at the Closing or upon Purchaser's default hereunder. Any interest earned on the Deposits shall belong to and shall not be credited against the Purchase Price, except as specifically required hereby. All rights of Purchaser hereunder and all Deposits tendered pursuant to this Agreement shall not constitute a lien upon the Condominium or any portion thereof.

- 2 -

5.    <u>Seller's Financing</u>.   Seller has borrowed money from lenders in connection with construction and development and/or financing of the Condominium.  Purchaser agrees that any lender advancing funds for Seller's use in connection with the Condominium will have, until closing,  a mortgage on or other interest in the Unit and the Condominium with priority senior and paramount to any interest or rights Purchaser may have therein, if any, and including any beneficial interest pursuant to this Agreement or under any principle of equity or otherwise.   At closing, Seller shall cause the then applicable mortgages to be released as a lien or encumbrance against the Unit and may use Purchaser's closing proceeds for such purpose.  Neither this Agreement, nor Purchaser's payment of the Deposits required hereunder, will give Purchaser any lien or claim against the Unit or the Condominium, including any possible equitable lien.  Without limiting the generality of the foregoing, Purchaser's rights under this Agreement (and the Deposits made hereunder) will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit and/or the Condominium, even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6.    <u>Insulation; Energy Efficiency</u>.   Seller has advised Purchaser, as required by the rules of the Federal Trade Commission, that it has installed (in connection with the construction of the Unit), the following insulation:

| <u>Type</u> | <u>Thickness</u> | <u>R-Value</u> | <u>Location</u> |
|---|---|---|---|
| Batt insulation | 3" | R-5 | Interior Demising Walls |
| Foil with air space insulation | Varies | R-5 | Exterior Demising Walls |
| Board insulation, topping slab and waterproofing membranes | Average between 1" – 3" (depending on sloping for drainage) | R -19 | Roof |

This R-value information is based solely on the information given by the appropriate manufacturers and Purchaser agrees that Seller is not responsible for any manufacturers' errors.

To the extent required by applicable law, each purchaser may have the energy efficiency rating of the Condominium building determined.   Purchaser also acknowledges receipt of the information brochure prepared by the Florida Department of Community Affairs regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's rights, under this Agreement, to make changes in Seller's Plans and Specifications, and to limit Seller's liability to Purchaser.

7.    <u>Completion Date</u>.   Seller has substantially completed construction of the Unit and the Condominium.

8.    <u>Inspection Prior to Closing</u>.  Purchaser will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative.  At that time, Purchaser will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit, itself) which Purchaser discovers.  If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Broward County, Florida for similar property), Seller will be obligated to correct those



defects, at its cost, within a reasonable period of time after closing, but Seller's obligation to correct any such defects will not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted. If Purchaser fails to take advantage of the right to a pre-closing inspection on the scheduled date and time, Seller will not be obligated to reschedule an inspection prior to closing.

Purchaser acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Purchaser agrees not to interfere with or interrupt any workmen at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Purchaser acknowledges that Seller is not obligated to agree to provide any extras or options.

Purchaser can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.     Closing Date. Purchaser understands that Seller has the right to schedule the date, time and place for closing, which shall be on ____March 14, 2017____.

Before Seller can require Purchaser to close, however, two (2) things must be done, which have already occurred:

(a)  Seller has recorded the Declaration and Exhibits on June 28, 2016, under Instrument Number 113779593 in the Broward County Public Records; and

(b)  Seller has obtained a temporary, partial or permanent certificate of occupancy for (or covering) the Unit from the proper governmental agency (a certificate of occupancy being the official approval needed before a unit may be lived in), but subject and subordinate to the provisions of Sections 8 and 35 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed. The certificate of substantial completion described in Section 718.104(4)(e), F.S. has been recorded.

Purchaser will be given at least ten (10) days' notice of the date, time and place of closing. Seller is authorized to postpone the closing for any reason and Purchaser will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given orally, by telephone, telegraph, telex, telecopy, mail, email or other reasonable means of communication, at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement, unless Seller has received written notice from Purchaser of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Purchaser, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and will not be considered the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Purchaser agrees, however, to follow all instructions given in any such formal notice and written confirmation.

- 4 -

If Purchaser fails to receive any of these notices because Purchaser failed to advise Seller of any change of address or phone, telecopy or telex number, because Purchaser has failed to pick up a letter when he has been advised of an attempted delivery or because of any other reason, Purchaser will not be relieved of his obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule the closing at Purchaser's request, or if Purchaser is a corporation and Purchaser fails to produce the necessary corporate papers Seller requests and, as a result, closing is delayed, or if the closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Purchaser agrees to pay, at closing, a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled the closing to the date of actual closing. All prorations will be made as of the originally scheduled date.  Purchaser understands that Seller is not required to reschedule or to permit a delay in closing.

10.     Closing.  The term "closing" refers to the time when Seller delivers the deed to the Unit to Purchaser and ownership changes hands.  Purchaser's ownership is referred to as "title".  Seller promises that the title Purchaser will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below).  Notwithstanding that Purchaser is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price and the transaction is governed by the Real Estate Settlement Procedures Act (RESPA), Purchaser shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Purchaser may elect to have Seller's closing agent issue the title insurance commitment and policy as provided hereinafter.  In the event that the transaction is governed by RESPA and Purchaser elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller: (i) Purchaser shall provide Seller with written notice of same within ten (10) days following Buyer's execution of this Agreement (unless the estimated closing date is less than ten (10) days following the date hereof, in which event, such notice must be given simultaneously with Purchaser's execution of this Agreement) (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Purchaser and (iii) Purchaser shall, no later than five (5) business days prior to closing (or on the date of this Agreement, if the closing is scheduled less than five (5) business days following the date of this Agreement hereinafter the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Purchaser), provided that if Purchaser fails to give Seller written notice of any such defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Unless Purchaser has elected, in the manner specified above and if permitted to do so under the conditions set forth above, to obtain a title insurance commitment from its own sources (to the extent that the transaction is governed by RESPA), Purchaser agrees that Seller's designee shall act as closing agent and shall issue the title insurance commitment (and subsequent title insurance policy), which shall be paid for by Seller as provided hereafter.  Purchaser will receive two (2) documents at closing which Purchaser agrees to accept as proof that Purchaser's title is as represented above:

a) ⟳  <u>A written commitment</u> from a title insurance company licensed in Florida agreeing to <u>issue a policy insuring title, or the policy itself</u>.  This commitment (or policy) will list any exceptions to title which Purchaser agrees to take title subject to) (collectively, the "Permitted Exceptions"):

i)      Liability for all taxes or assessments affecting the Unit starting the year Purchaser receives title and continuing thereafter;

ii)     All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the public records. For example, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

iii)    The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

iv)     Pending governmental liens for public improvements as of closing (Seller will be responsible, however, for certified governmental liens for public improvements as of closing; provided, however, that to the extent that any such certified liens are payable in installments, Seller shall only be responsible for those installments coming due prior to closing, and Purchaser hereby assumes all installments coming due after closing);

v)      All standard printed exceptions contained in an ALTA owner's title insurance policy issued in Broward County, Florida; and

vi)     Any open Notice of Commencement related to Seller's construction or development of the Condominium (although Seller will provide an unsecured indemnification to the title insurer, on a form reasonably acceptable to Seller, to induce the title insurer to insure Purchaser's title without exception for unfiled construction liens relating to the Notice of Commencement).  To the extent that this transaction is governed by RESPA and Purchaser elects to obtain title services through its own sources rather than from Seller's designee, Seller will only provide the title insurer the same unsecured indemnification described above and, in such event, Purchaser shall be required to assume all obligations to obtain a title insurance commitment (and subsequent title insurance policy) without exception for unfiled construction liens, or otherwise, Purchaser agrees to take title subject to the Notice of Commencement and any related unfiled liens;

vii)    Dedications shown on the plat of ATLANTIC SHORES NORTH BEACH SECTION, as recorded in Plat Book 9, Page 36, of the Public Records of Broward County, Florida, as affected by Resolution No. 2395 recorded February 25, 1959 in Official Records Book 1469, Page 473, Ordinance No. 0-68-163 recorded November 5, 1968 in Official Records Book 3784, Page 325, Quit Claim Deed recorded November 12, 1968 in Official Records Book 3789, Page 354, Easement recorded November 12, 1968 in Official Records Book 3789, Page 356, and Quit Claim Deed recorded

- 6 -

February 25, 1971 in Official Records Book 4431, Page 872, all of the Public Records of Broward County, Florida;

viii)   Perpetual Beach Storm Damage Reduction Easement recorded January 9, 2002 in Official Records Book 32599, Page 1510, of the Public Records of Broward County, Florida;

ix)   Permanent Easement in favor of the City of Hollywood, Florida recorded July 9, 2010 in Official Records Book 47207, Page 1176, of the Public Records of Broward County, Florida;

x)   Temporary Easement in favor of the City of Hollywood, Florida recorded July 9, 2010 in Official Records Book 47207, Page 1180, of the Public Records of Broward County, Florida;

xi)   Terms and conditions contained in Ordinance No. 0-2010-22 recorded July 9, 2010 in Official Records Book 47207, Page 1187, of the Public Records of Broward County, Florida;

xii)   Terms and conditions contained in City of Hollywood Development Review Board Resolution No. 07-DPV-56 recorded December 18, 2008 in Official Records Book 45876, Page 1093, of the Public Records of Broward County, Florida;

xiii)   The right, title or interest, if any, of the public to use as a public beach or recreation area any part of the Land lying between the water abutting the Land and the most inland of any of the following: (a) the natural line of vegetation; (b) the most extreme high water mark; (c) the bulkhead line, or (d) any other line which has been or which hereafter may be legally established as relating to such public use;

xiv)   Land lying seaward of the most inland of the: (a) the Mean High Water Line of the abutting body of water; or, (b) the Erosion Control Line, if any, established as to said land pursuant to Chapter 161, Florida Statutes;

xv)   Any matters not listed above as long as affirmative title insurance is given for these matters.

Purchaser understands, however, that no limitation on Purchaser's title is anticipated to prohibit construction of the Unit, nor the use of it as a residence, subject to the Condominium Documents.

b)   A Special Warranty Deed: At closing, Seller promises to give Purchaser a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above and taxes as described below. To the extent that the transaction is governed by RESPA and in the event Purchaser elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, Purchaser will receive the special warranty deed described in Section 10(b) above which Purchaser agrees to accept as proof that Purchaser's title is as represented above.

- 7 -

Purchaser will also receive at closing a bill of sale for any appliances included in the Unit and Seller's form of owner's ("no lien") affidavit and FIRPTA (non-foreign) affidavit.  When Purchaser receives the special warranty deed at closing, Purchaser will sign a closing agreement and all papers that Seller deems necessary or appropriate.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title, but Seller will be not obligated to do so.  If Seller cannot or elects not to correct such title defects, Purchaser will have two options:

i)      Purchaser can accept title in the condition Seller offers it (with defects) and pay the full purchase price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit.  Purchaser will not make any claims against Seller because of the defects; or

ii)     Purchaser can cancel this Agreement and receive a full refund of Purchaser's deposits, and in such event, Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Purchaser.

Seller shall, at Seller's expense, deliver to Buyer, prior to or at closing, an owner's title insurance commitment ("Commitment"), prepared and issued by Seller's attorney, as agent for a nationally recognized title insurance underwriter.  Subsequent to closing, Seller shall cause its attorney or title agent to issue an owner's title policy ("Policy") at Seller's expense in accordance with the terms of the Commitment.  Seller shall not supply abstracts of title.  Buyer may elect to decline the Commitment provided by Seller, however, Buyer shall not be entitled to any credits toward or reimbursement of the cost of a title report or title insurance where Buyer elects to decline the Commitment or where Buyer elects to obtain its own title insurance policy elsewhere, as Seller is providing same at no cost to Buyer.

At the same time Purchaser receives the special warranty deed, Purchaser agrees to pay the balance of the purchase price and any additional amounts owed under this Agreement.  Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Purchaser will grant to Seller, in writing, at closing, or thereafter, at Seller's request).

11.     Closing Costs.  Purchaser understands that, in addition to the purchase price for the Unit, Purchaser must pay certain other fees or "closing costs" when title is delivered to Purchaser at closing.  These include:

(a)     A "closing charge" equal to one and three quarters percent (1.75%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price).  This charge will be used, in part, to provide additional revenue to the Seller and to pay for the costs of officially recording the deed, for documentary stamp taxes on the special warranty deed, and in reimbursement for certain of Seller's closing administration expenses and Seller's attorneys' fees in connection with closing (all of which costs will be paid for by Seller).  The foregoing one and three quarters percent (1.75%) closing charge is based on the assumption that documentary stamp taxes on the special warranty deed will be, at closing, at the rate of seventy cents ($.70) for each one hundred dollars ($100.00) of Purchase Price and that surtax will not be applicable with respect to the sale of the Unit.  In the event that: (i) surtax is imposed on the transaction; (ii) any sales tax is imposed in connection with the subject transaction; (iii) there is an increase in the documentary stamp tax rate; (iv) any interim services fee is imposed by any governmental authority; or (v) any new governmental tax or charge on deeds is imposed, then such additional charges will be paid by Purchaser at closing.



- 8 -

(b)     To the extent that the transaction is governed by RESPA and Purchaser has elected, in the manner provided herein, to obtain a title insurance commitment and policy from its own sources, all costs in connection with title search, title review and the premium for the title insurance commitment and title insurance policy, and any endorsement if applicable, at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any).

(c)     Loan fees, closing costs, lender's attorney's fees, closing agent charges, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Purchaser a mortgage, if applicable.  The amount of these charges is now unknown. Additionally, if Purchaser obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Purchaser agrees to pay, in addition to any other sums described in this Agreement, such closing agent a fee equal to seven and hundred fifty dollars ($950.00), plus reimbursement of applicable costs, for the agent's title examination, title searching and closing services, including, without limitation, preparation of a settlement statement and related disclosures related to acting as "loan closing agent". The amount of all lender's charges is now unknown, but will be the sole obligation of Purchaser. If the transaction is governed by RESPA, Purchaser shall not be obligated to use Seller's closing agent as Purchaser's closing agent, and if Purchaser elects to use another agent, Purchaser will not be obligated to pay Seller's closing agent the amounts described in this Section (although Purchaser will be obligated to pay Purchaser's loan closing agent such fees and expenses as are agreed to by Purchaser and that closing agent).  Notwithstanding any of the references in this Section to coordinating closing with any lender that Purchaser may elect to obtain, nothing herein shall be deemed to make this Agreement, or Purchaser's obligations under this Agreement, conditional or contingent, in any manner on Purchaser obtaining a loan to finance any portion of the Purchase Price; it being the agreement of Purchaser that the provisions of paragraph Section 3 of this Agreement shall be paramount and that Purchaser shall be obligated to close on an "all cash" basis.

*RESOLVE*

(d)     A working capital contribution in an amount equal to twice the monthly maintenance charge to become payable to the Condominium Association (as hereinafter defined), which charge is payable directly to the Association to provide it with initial capital and will not be credited against regular assessments.

(e)     A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to the closing of the Unit.  The amount of this charge is now unknown.

*Hook up?*   ⑥


(f)     Any charge for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Purchaser and Seller.

(g)     Reimbursement to Seller, and/or Seller's closing agent, for charges incurred in connection with coordinating the closing with Purchaser and/or Purchaser's lender, including, without limitation, charges for overnight courier and local delivery expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.  The amount of these charges is now unknown.

(h)     The late funding charges provided for elsewhere in this Agreement.  The amount of any such charges is now unknown.

(i)     In the event Seller allows any delay in closing (which it has no obligation to do) or any other change in closing (which it has no obligation to do), Seller may impose a "redraw fee" to reimburse Seller for any additional costs it incurs as a result of any such rescheduling or change.

Current expenses of the Unit (for example, taxes and governmental assessments and current monthly assessments of the Association will be prorated between Purchaser and Seller as of the date of closing. Additionally, at closing, Purchaser shall be obligated to prepay the next month's maintenance assessment to the Association. If taxes for the year of closing are assessed on the Condominium as a whole, Purchaser shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit, from the date of closing through the end of the applicable calendar year of closing. If taxes for the year of closing are assessed on a unit-by-unit basis, Purchaser and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Purchaser being responsible for paying the full amount of the tax bill and Seller reimbursing Purchaser for Seller's prorated share of those taxes. Purchaser agrees that Seller's prorated share of the taxes due as of closing need not be paid to Purchaser, however, until the actual tax bill is presented to Seller, any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party. If the tax assessment is the subject of a protest, the reproration based on the actual tax bill will be postponed until a final determination of the tax assessment is adjudicated. Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit, the Common Elements or any other portion of the Condominium for prior years and/or the year of closing. BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION. This subsection shall survive (continue to be effective) after closing.

12.     <u>Adjustments with the Association</u>. Purchaser understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, common element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, management fees, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller. The Association will reimburse Seller out of the initial contributions and regular assessments paid by Purchaser and other owners, as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Association. No initial contributions (by purchasers of units in the Condominium) to the Condominium Association may be used for such purposes, however, as long as any guaranty by Seller of the Association's annual budget is in effect.

13.     <u>Default</u>. If Purchaser fails to perform any of Purchaser's obligations under this Agreement (including making scheduled deposits and other payments) Purchaser will be in "default". If Purchaser is still in default ten (10) days after Seller sends Purchaser written notice thereof, Seller shall be entitled to the remedies provided herein. If, however, Purchaser's default is in failing to close on the scheduled closing date, then Seller can terminate this Agreement without giving Purchaser any prior (or subsequent) notification or opportunity to close at a later date.

Upon Purchaser's default (and the expiration of any notice and cure period, if applicable), all of Purchaser's rights under this Agreement will terminate and Seller can resell the Unit for a higher or lower price without any accounting to Purchaser. Purchaser agrees that Seller's damages in the event of Purchaser's default cannot readily be ascertained and therefore all sums paid hereunder by Purchaser, including without limitation, the Deposit, and any interest earned thereon, shall be retained by Seller as liquidated and agreed upon damages.

If Seller defaults under this Agreement, Purchaser will give Seller twenty (20) days' written notice of said default and if Seller has not cured the default within such period, Purchaser will have such rights set forth herein.  The liability of Seller, in the event of any default of Seller hereunder, shall in no event exceed twenty five thousand dollars ($25,000.00).  In no event shall Seller be liable to Purchaser for any damages which Purchaser may sustain other than the damages set forth in this Section 13, or specific performance of this Agreement.  Any measure of Purchaser's damages shall not include any incidental, indirect, consequential or punitive damages.

14.     <u>Construction Specifications</u>.  Purchaser understands and agrees that in designing the Condominium, the stairwells of the building were intended solely for ingress and egress in the event of emergency and, as such, are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells.  Purchaser understands and agrees that storage spaces, designated trash areas, service corridors, and back of house areas are constructed and left unfinished solely as to be functional without regard to the appearance of said trash areas, service corridors, and back of house areas.  Further, Purchaser hereby acknowledges and agrees that sound transmission in a high-rise building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units or mechanical equipment can often be heard in other Units.  Seller does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and Purchaser hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound transmission.

The agreements and waivers of Purchaser contained in this Section 14 will survive (continue to be effective after) closing.

15.     <u>Certain Items and Materials</u>.  Purchaser understands and agrees that, other than the "Standard Improvements" which include (i) refrigerator, freezer, oven, cooktop, downdraft, dishwasher, microwave, washer and dryer, and (ii) floor coverings and plumbing fixtures in bathrooms, the Unit will be delivered in "Standard Finish Condition".   Standard Finish Condition means that the Unit will be delivered in a condition which includes the Standard Improvements and is otherwise ready for decoration and finish by the Purchaser after closing.  Except for the Standard Improvements, Purchaser understands and agrees that no flooring will be provided, no lighting fixtures will be provided, no walls will be painted, and that certain items, such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit: wall coverings (including paint other than base primer), shelving, closets, bathroom accessories, light sconces, recessed lighting, pendants, chandeliers, dropped ceilings, cove lighting, accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, touch screen panels, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, glass railings, carpets or other floor finishes coverings and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, brick, scored concrete or wood trim), planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time.  This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only.  Items such as these will not be included in the Unit unless specifically provided for in any Rider or Schedule to this Agreement signed by both Purchaser and Seller.  Certain of these items may not even be available.  In the event that Seller does provide any of these or other items, however, Purchaser agrees to accept them, although not requested by Purchaser, as long as Purchaser is not required to pay for such items.  There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Purchaser further understands and agrees that certain items and finishings, if included with the Unit, such as tile, cabinets, wood, stain, grout, wall and ceiling textures, cultured marble, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any).  If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller may substitute equipment, material, appliances, etc., with items which, in Seller's opinion, are of equal or better quality (regardless of cost).  Purchaser also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any).  Purchaser recognizes that certain colors as shown in displays or in models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

If Seller allows Purchaser to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Purchaser understands and agrees that Purchaser must submit his selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Purchaser.  If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller, in Seller's sole discretion.

The agreements and waivers of Purchaser contained in this Section 15 will survive (continue to be effective after) closing.

16.    Variations.  Purchaser understands that the color and texture of paint, carpet, stone, granite, marble, quartz and other items may vary from samples, and therefore, Seller shall not be responsible for variations in the color or texture of the finish of the items such as appliances, plumbing fixtures, paint, carpeting, tile and other items from samples due to such manufacturer variations, nor shall variations constitute an objection to closing or entitle Purchaser a reduction in the Purchase Price or to compensation therefore. Furthermore, any natural stone or wood products will have naturally inherent variations in color, graining, veining, finish and texture and will also vary from sample to sample. It is understood and agreed by Purchaser that, due to the nature of these products there will most likely be variations in installed products from those shown or displayed by Seller.  Purchaser hereby accepts such variations, and such variations will not constitute an objection to closing or entitle Purchaser to compensation therefore, and Purchaser hereby releases, waives and holds Seller completely harmless from and against any and all responsibility for any such variation of such products.

17.    Maintenance Fees. The Condominium Documents disclose that the Condominium shall be managed, operated and maintained by Sage Beach Condominium Association, Inc., a Florida corporation not for profit (the "Association").  Purchaser understands and agrees that the Estimated Operating Budget for the Association contained in the Condominium Documents provides only an estimate of what it will cost to run the Association during the period of time stated in the estimated annual budget of the Association (the "Budget").  The monthly assessments shown in the Budget for the Unit is guaranteed, if at all, in the manner stated in the Condominium Documents.  The Budget itself however, as opposed to the levels of assessments payable to the Association, is not guaranteed to accurately predict actual expenditures.  Changes in the Budget may be made at any time to cover increases or decreases in actual expenses or in estimates.  It is intended that Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Association with an option to renew such waiver for the 2nd year as well.  Thereafter, on an annual basis, a majority of the Association's members may vote to continue not to provide any reserves. If an election is, in fact, made to waive reserves, the assessments per unit payable to the Association will be as set forth in the Budget as "Assessments per Unit - Without Reserves".  If no such election is made, the assessments per Unit payable to the Association will be as set forth in the Budget as "Assessments per Unit - With Reserves".

- 12 -

18.    Condominium Association.    This Agreement is also Purchaser's application for membership in the Association, which membership shall automatically take effect at closing.  At that time, Purchaser agrees to accept the liabilities and obligations of membership.

19.    Seller's Use of the Condominium Property.  As long as Seller owns a Unit or Units or is offering any Unit for sale, it and its agents can keep offices and model apartments within the Condominium Property.   Seller's salespeople can show these Units, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell or lease Units or develop and manage the Condominium Property, but Seller's use of the Condominium Property must be reasonable, in Seller's opinion, and can't unreasonably interfere, in Seller's opinion, with Purchaser's use and enjoyment of the Unit.  This Section 19 will survive (continue to be effective after) closing.

20.    Sales Commissions. Seller will pay, after closing, all sales commissions due any in-house sales personnel Seller has employed, and the cooperating broker named in Section 42 (if no name is written in Section 40, then same shall be deemed a representation by Purchaser that there is no cooperating broker involved in this transaction), in accordance with the terms of separate written agreements.  Seller has no responsibility to pay any sales commissions to any other broker or sales agent with whom Purchaser has dealt (unless Seller has agreed otherwise in writing).  Purchaser will be solely responsible to pay any such other brokers.  Purchaser represents and warrants to Seller that Purchaser has not dealt with, nor has the sale been procured by, any real estate broker, salesman or finder, other than those salesperson retained by Seller and the cooperating broker described on the last page of this Agreement, if any, and Seller's in-house staff.  Purchaser will indemnify Seller against all claims made against Seller by any other brokers or sales agents (and agrees also to pay all costs and attorneys' fees actually incurred by Seller because of these claims).  This Section 20 will survive (continue to be effective after) closing.

21.    Notices.  Whenever Purchaser is required or desires to give notice to Seller, the notice must be in writing and it must be sent by (a) certified mail, postage prepaid, with a return receipt requested, or (b) a recognized overnight courier service (i.e. Federal Express, United Parcel Service, etc.) to Seller at 1441 Brickell Avenue, Suite 1510, Miami, Florida 33131, or other such address as Seller may otherwise direct.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Purchaser, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Purchaser may be sent by regular air mail); (ii) facsimile transmission, if Purchaser has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., Federal Express, United Parcel Service, etc.), to the address for Purchaser set forth on Page 1 of the Agreement.

A change of address notice is effective when it is received.  All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Purchaser are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22.    Transfer or Assignment.  Purchaser shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable), in Seller's sole and absolute discretion.  To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee established by Seller, in its sole and absolute discretion.  Any such assignee must fully assume all of the

- 13 -

obligations of Purchaser hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. For purposes of this Section 22, the sale, transfer or pledge of any beneficial interest in Purchaser shall be deemed an assignment hereunder requiring prior consent of Seller. If Purchaser is a corporation, partnership, limited liability company, other business entity, trustee or nominee, a transfer of any stock, partnership or membership interest, equity, beneficial or principal interest in Purchaser will constitute an assignment of this Agreement requiring consent. Purchaser acknowledges and agrees that Seller's ability to sell other Units owned by Seller within the Condominium and the value of such Units owned by Seller will be diminished and harmed by Purchaser attempting to resell the Unit through any brokers (or otherwise) or advertising the Unit for sale in any publications prior to Purchaser receiving fee simple title to the Unit and that Seller shall be irreparably harmed by such actions. Therefore, Purchaser covenants and agrees not to enter into a listing agreement for the sale of the Unit with any broker anywhere within the United States or internationally, or to advertise or cause the Unit to be advertised for sale in any newspaper, trade magazine, or other publication anywhere in the United States or internationally, prior to Closing. A breach of the provisions of this Section 22 shall be a default hereunder by Purchaser entitling Seller to exercise its remedies under this Agreement.

Notwithstanding the foregoing, Purchaser may assign its rights and obligations under this Agreement to any immediate family member, any trust for the benefit of Purchaser and/or his immediate family members and/or any corporation, partnership or other entity the majority of which is beneficially owned by Purchaser (or his immediate family members), or has common beneficial ownership with Purchaser, prior to closing provided not less than ten (10) days prior to closing Purchaser and its proposed assignee (a) execute and deliver to Seller an Assignment of Purchase Agreement in the form provided or approved by Seller in its sole and absolute discretion, and (b) deliver to Seller the Articles of Organization (or equivalent documents) for the assignee entity establishing the above requirements are met, if applicable.

23.   Others Bound by this Agreement.   If Purchaser dies, is adjudicated incompetent, or in any way loses legal control of his or her affairs, this Agreement will be binding upon Purchaser's heirs and personal representatives. If Purchaser has received permission to assign or transfer Purchaser's interest in this Agreement, this Agreement will bind an individual or entity receiving such interest but will not otherwise relieve Purchaser of Purchaser's obligations hereunder. If Purchaser is a corporation, limited liability company ("LLC"), or other business entity, this Agreement will bind any successor corporation, LLC, or entity. If more than one person signs this Agreement as Purchaser, each will be equally liable, on a joint and several basis, for the full performance of all Purchaser's duties and obligations under it, and Seller can enforce the terms of this Agreement against any and all of such individuals or entities.

24.   Public Records.   Purchaser authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Broward County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

25.   Purchaser's Right to Cancel.

**THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF**

RECEIPT FROM THE SELLER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.  ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED.  BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.   FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER.  ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS.  SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

26.     ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

27.     Florida Law; Severability.  This shall be interpreted and construed according to the laws of the State of Florida, without giving effect to the principles of conflict of laws, except as specifically preempted by Federal Law.

Without limiting the generality of the foregoing, it is Purchaser's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts shall be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified.   If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible, strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Purchaser's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Purchaser has the right to cancel this Agreement and receive a refund of his/her/its deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Purchaser or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

28.     Changes to Condominium Documents.  Seller may revise or make changes in to any of the Condominium Documents in its sole discretion.  Purchaser will have fifteen (15) days from the date of receipt of any such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Purchaser, in which to cancel this Agreement (by delivering written notice to Seller of such cancellation within such fifteen (15) day period) and receive a refund of any Deposits with applicable interest thereon.  Seller will be relieved of all obligations under this Agreement when Seller refunds the Deposits and interest.  Purchaser will not be permitted to prevent Seller from making any change it wishes to make in its sole discretion, nor to pursue any remedy other than the fifteen (15) day

- 15 -

cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Purchaser).

If Purchaser has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Purchaser, Purchaser's failure to request cancellation in writing within the fifteen (15) day period will mean that Purchaser accepts the change and waives irrevocably his/her/its right so to cancel.  All rights of cancellation will terminate, if not sooner, upon closing.  After closing, Purchaser agrees to accept any changes Seller may make or may have made to the Condominium Documents as "Developer" thereunder.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents, even though changes occur in the permitting stage and during construction; and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.  Such substitution, combination and/or subdivision shall not be deemed to be either material or adverse.  This Section 28 will survive (continue to be effective after) closing.

29.     Time of Essence.  The performance of all obligations of Purchaser on the precise dates and at the precise times stated in this Agreement is of absolute importance, and Purchaser's failure to so perform on time shall be deemed a default, time being of the essence, with respect to the obligations of the parties to this Agreement, and each of the terms and provisions of this Agreement.

30.     Disclaimer of Implied Warranties.  All manufacturers' warranties will be passed through to Purchaser at closing and all items covered by manufacturers' warranties are expressly not warranted by Seller, except as may be provided by Section 718.203(1)(b) and (f), Florida Statutes.  At closing, Purchaser will receive the statutory warranties imposed by the Act in effect at the time of execution of this Agreement.

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Act, to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed.  Seller has not given, and Purchaser has not relied on or bargained for, any such warranties.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).

Purchaser acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to view and/or natural light.

Additionally, properties in South Florida are subject to tropical conditions, which may include quick, heavy rain storms, high blustery winds, hurricanes and/or flooding.  These conditions may be extreme, creating sometimes unpleasant or uncomfortable conditions or even unsafe conditions, and can be expected to be more extreme at properties like the Condominium.  At certain times, the conditions may be such where use and enjoyment of outdoor amenities such as the pool or pool deck and/or other areas may be unsafe and/or not comfortable or recommended.  These conditions are to be expected at

- 16 -

properties near the water. Each Purchaser understands and agrees to accept these risks and conditions and to assume all liabilities associated with same. By executing and delivering this Agreement and closing, Purchaser shall be deemed to have released and indemnified Seller, Seller's Affiliates and Seller's third party consultants, including without limitation, Seller's architect, from any against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, inconvenience and/or personal injury or death to or suffered by Purchaser or any of "Purchaser's Guests" (as defined below) and any other person or any pets). Purchaser understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, shall be responsible for any of the conditions described above, and Seller hereby disclaims any responsibility for same which may be experienced by Purchaser, including his/her/its pets, family members and/or their guests, tenants and invitees (collectively "Purchaser's Guests").

This Section 30 shall survive (continue to be effective after) closing.

31. <u>Return of Condominium Documents</u>. If this Agreement is canceled for any reason, Purchaser will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted. If Purchaser fails to return the Condominium Documents, Purchaser agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

32. <u>Governmental Requirements</u>. In the event that governmental authorities or Seller require any changes to the models, site plan, plat, or any other documents requiring governmental approval, relating to the Condominium or any other portion of the Property, Purchaser hereby consents to such changes, provided that they do not materially and adversely affect the use of the Unit as a residence. In the event of subsequent changes to any law, statute, ordinance or regulation requiring Seller to have hurricane shutters or wind-resistant glass installed for the Unit, or any other material improvement, then the cost thereof shall be reimbursed by Purchaser to Seller at Closing. In the event of any conflict between "Code" requirements set forth in the Florida Building Code, pursuant to Section 553.84, F.S. ("Code") and manufacturers' instructions, Seller shall be governed by the Code.

33. <u>Waiver</u>. Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

34. <u>Survival</u>. Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

35. <u>Time Periods</u>. If the final date of any period set forth herein (including, but not limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday. The term "days" as used herein shall in all cases mean calendar days, with the exception of the provisions in this Agreement that expressly state "business days", which term shall mean each day except for any Saturday, Sunday or legal holiday under the laws of the United States of America.

36. <u>Substantial Completion</u>. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so completed or substantially completed in Seller's opinion. Notwithstanding the foregoing, however, neither the Unit nor the building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Purchaser) is physically habitable and usable for its

- 17 -

intended purpose.  The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it.  Other units (and other portions of the building) may not necessarily be so complete and useable.  Before Seller can require Purchaser to close on title to the Unit, Seller agrees that no closing shall occur until the Declaration has been amended to include the certificate required by Section 718.104(4)(e), Florida Statutes.

37.    Radon.  Under the laws of the State of Florida, Purchaser is hereby advised that radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from the Broward County Public Health Unit.  The foregoing notice is provided in order to comply with state law and is for informational purposes only.  Seller does not conduct radon testing with respect to the Unit or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions with respect to the Condominium.

38.    Coastal Construction Control Line.  Purchaser is aware that the Unit and/or portions of the Condominium maybe located in coastal areas partially or totally seaward of the coastal construction line as defined in Section 161.053 F.S.  Purchaser is fully aware of the character of the regulation of the property in such coastal areas and Purchaser hereby waives and releases any right to receive at closing a survey delineating the location of the coastal construction line with respect to the Unit and the Condominium in accordance with Section 161.57 F.S.

39.    Representations and Confirmations.  Purchaser acknowledges, warrants, represents and agrees that this Agreement is being entered into by Purchaser without reliance upon any representations concerning any potential for future profit, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any other monetary or financial advice. Purchaser acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Purchaser in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Purchaser hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon.  Purchaser warrants that Purchaser has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in, or resale value of, the Unit; (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future; (c) traffic conditions in, near or around the Condominium; (d) disturbance from nearby properties; (e) disturbance from air or vehicular traffic; and (f) any future use of adjacent properties.

40.    Incorporation: Definitions.  The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include, in their meaning, all modifications, riders and addenda to it signed by Purchaser and Seller, as well as any amendments, if applicable.

41.    Entire Agreement.  This Agreement is the entire contract for the sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement.  Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement or the Condominium Documents, are void and have no effect. Purchaser has not relied on them.

- 18 -

42.     Cooperating Broker  __First Way Realty__ (if no name is filled in, Purchaser shall be deemed to have represented and warranted to Seller that no cooperating broker was involved in the subject transaction. See Section 20).

43.     Casualty.  Prior to closing, Seller shall assume all risk of loss by reason of fire, windstorm or other casualty.  If a casualty occurs to the Condominium Property prior to closing, Seller may, at Seller's option, either cancel this Agreement and return all deposits placed hereunder, in which event this Agreement shall become void and of no effect, or rebuild as soon as possible, in which event this Agreement shall be in full force and effect, provided, however, that such reconstruction is accomplished within the time specified in this Agreement.  Under no circumstances shall Purchaser have any interest in any insurance proceeds attributable to said casualty.  Until closing is completed, Purchaser shall not be entitled to any insurance proceeds from a casualty or proceeds resulting from any condemnation.

44.     Move-In Date.  Purchaser shall be entitled to possession of the Unit as of the closing date; however, Purchaser's right to move into the Unit shall be subject to a "move-in" schedule for all purchasers and the move must be scheduled with the Association, or its manager.  Moving shall only be permitted in accordance with the Rules and Regulations of the Association.

45.     BUDGET. THE BUDGET CONTAINED IN THE CONDOMINIUM DOCUMENTS HAS BEEN PREPARED IN ACCORDANCE WITH THE ACT, IS A GOOD-FAITH ESTIMATE ONLY AND REPRESENTS AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER.  ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS.  SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

46.     Offer.   The submission by Seller of this Agreement to Purchaser for examination does not constitute an offer by Seller to Purchaser, or a reservation of or option for any unit in the Condominium.  This Agreement shall not become binding until executed and delivered by both Purchaser and Seller.  Upon execution by Seller, an executed copy of this Agreement shall be sent to Purchaser or Seller shall otherwise demonstrate its acceptance of Purchaser's offer.  Otherwise any such offer shall be considered rejected.

47.     Mold Disclosure.  Purchaser understands that there may develop at some future time the presence of mold, mildew, spores, toxins, or any other type of fungus, which may be caused by, due to, or arise out of a variety of conditions, or Purchaser's inaction, any of which may take place within the Unit or other portion of the building attached thereto, including, without limitation, a lack of care of the Unit or an adjoining unit within the same building structure, by the Seller or adjoining unit owner.  However, Purchaser understands that it is Purchaser's sole responsibility for detecting and remedying the presence of such mold, mildew, spores, toxins, or any other type of fungus, and Seller has no liability or responsibility in connection therewith.  Seller shall bear no liability or incur any curative undertaking resulting from those matters cited in this Section 47 unless clearly present at the time of the Closing hereunder and identified by Purchaser and communicated to Seller in writing prior to Closing, and under no circumstance shall Seller be liable for Purchaser's consequential damages incurred, if any.  Purchaser hereby knowingly waives, discharges, releases and relinquishes any and all claims and/or causes of action that may be undertaken contrary to the provisions of this Section 46, or involving Seller, including any of Seller's agents, principals and consultants. Purchaser understands that the provisions of this Section 46 are a material inducement to Seller entering into this Agreement.

48.     Attorney's Fees and Costs.  In connection with any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' fees for

services rendered in connection with such litigation, including, without limitation, all appellate, bankruptcy and post-judgment proceedings. This Section 47 shall survive Closing.

49.  Energy Disclosures. Pursuant to Sections 553.9085 and 553.996, Florida Statutes, Purchaser may request that Seller cause a State Certified Energy Rater to perform an energy efficiency rating on the Unit. Purchaser hereby releases Seller from any responsibility or liability for the accuracy or level of rating and Purchaser understands and agrees that (i) this Agreement is not contingent upon Purchaser approving the rating, (ii) the rating is solely for Purchaser's own information, and (iii) that Purchaser will pay the total cost of obtaining the rating. A copy of the Florida Building Energy-Efficiency Rating System brochure prepared by the Florida Department of Community Affairs in accordance with Section 553.996, Florida Statutes, is attached hereto and made a part of the Condominium Documents and this Agreement, by reference thereto. PURCHASER ACKNOWLEDGES RECEIPT OF THE ENERGY-EFFICIENCY RATING BROCHURE DISTRIBUTED BY THE STATE OF FLORIDA DEPARTMENT OF COMMUNITY AFFAIRS AND STATES THAT PURCHASER WAIVES THE OPPORTUNITY TO OBTAIN AN ENERGY-EFFICIENCY RATING ON THE UNIT. Seller is providing this disclosure statement to Purchaser in compliance with Sections 553.9085 and 553.996, Florida Statutes. This disclosure statement is intended for the sole and exclusive use of Purchaser for the transaction contemplated herein only and Seller shall not be liable or responsible to any third party who has relied upon the information contained herein. Purchaser acknowledges its receipt, review and understanding of this disclosure statement prior to, or at the time of, Purchaser's execution of this Agreement.

50.  Waiver of Jury Trial. SELLER AND PURCHASER AGREE THAT NEITHER OF THEM, NOR ANY ASSIGNEE, SUCCESSOR, HEIR, OR LEGAL REPRESENTATIVE OF SELLER OR PURCHASER (ALL OF WHOM ARE HEREINAFTER REFERRED TO IN THIS SECTION 49 AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUITS, PROCEEDINGS, COUNTERCLAIMS, OR ANY OTHER LITIGATION PROCEDURES BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CONDOMINIUM DOCUMENTS, ANY RULES OR REGULATIONS OF THE ASSOCIATION, OR ANY INSTRUMENT EVIDENCING OR RELATING TO ANY OF THE FOREGOING, OR ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY ACTIONS, DEALINGS OR RELATIONSHIP BETWEEN OR AMONG THE PARTIES, OR ANY OF THEM. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION 49 HAVE BEEN FULLY NEGOTIATED BY THE PARTIES AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. SELLER HAS NOT IN ANY WAY INDICATED THAT THE PROVISIONS HEREOF WILL NOT BE FULLY ENFORCED. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE RIGHTS AND REMEDIES OF THE PURCHASER PURSUANT TO SECTIONS 718.111(3), 718.303 AND 718.506, FLORIDA STATUTES, SHALL NOT BE LIMITED OR ABRIDGED.

51.  USA Patriot Act/OFAC/IMLA-FAA. The Seller and Purchaser's rights hereunder are subject to (i) the Uniting and Strengthening America by Providing Appropriate Tool Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act"), as the same may be amended from time to time, and corresponding provisions of future laws; and (ii) the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, U.S. Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders"), and Purchaser represents and warrants that Purchaser is not listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable, and (iii) Purchaser's activities not violating the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, or the regulations or orders promulgated thereunder. This

- 20 -



Agreement is terminable by Seller in the event that the above representations and warranties are not true and correct.

52.  Florida Statutes Chapter 558.  THIS ACT CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS.  YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

53.  Construction Industries Recovery Fund.  PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIC VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:  (850) 487-1395; CONSTRUCTION INDUSTRY LICENSING BOARD, 1940 N. MONROE STREET, TALLAHASSEE, FL 32399.

54.  Miscellaneous.  The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Purchaser and Seller.  Purchaser acknowledges that the primary inducement for Purchaser to purchase under this Agreement is the Unit itself, and not the recreational amenities and other Common Elements.  A legible facsimile or electronic (including "pdf") copy of this Agreement and any signatures hereon shall be considered for all purposes as an original.

*(Signatures on following page)*

- 21 -

Witnesses:

PURCHASER:

Date:   NOU 16-16

SELLER:

PMG DRIFTWOOD, LLC,
a Florida limited liability company

By:

Authorized Representative

Date:   12/07/16.

- 22 -

## ADDENDUM TO PURCHASE AGREEMENT

**THIS ADDENDUM TO PURCHASE AGREEMENT** (this "Addendum") amends, modifies, supplements and clarifies the terms and conditions of that certain Purchase Agreement (the "Agreement") of even date herewith, by and between **PMG DRIFTWOOD, LLC**, a Florida limited liability company ("Seller"), and **TULIA E. QUIJANO DE HERNANDEZ** ("Buyer"). Buyer and Seller are hereinafter referred to, individually, as a "Party," and, collectively, as the "Parties."

## R E C I T A L S

WHEREAS, the Parties have executed the Agreement and related documents for the purchase and sale of Unit 2E in Sage Beach, a Condominium.

WHEREAS, the Parties desire to amend the Agreement in certain respects as more particularly set forth below.

NOW, THEREFORE, in consideration of the execution and delivery of this Addendum and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Recitals; Defined Terms.  The foregoing recitals are true and correct and are incorporated herein as if set forth herein at length.  Unless the context otherwise requires, all initial capitalized terms used but not defined in this Addendum shall have the meaning or meanings given to such terms in the Agreement.

2.      Assignment.  Paragraph 22 of the Agreement is hereby revised to reflect that Buyer may, without Seller's consent, assign its rights and obligations under the Agreement to any immediate family member, any trust for the benefit of Buyer and/or his immediate family members and/or any corporation, partnership or other entity the majority of which is beneficially owned by Buyer (or his immediate family members), or has common beneficial ownership with Buyer, prior to closing provided Buyer and its proposed assignee (a) execute and deliver to Seller an Assignment of Purchase Agreement in the form attached hereto as Exhibit A and (b) deliver to Seller the Articles of Organization, Bylaws or similar documents for the assignee entity establishing that one of the above requirements has been satisfied.

3.      HOA Fees.  At closing, Seller agrees to issue to Buyer a credit against the Purchase Price in the amount of $49,000.00 representing the estimated cost of twenty-four (24) months of condominium assessments for the Unit.  It shall be Buyer's responsibility to pay such HOA fees directly to the Condominium association, and Seller shall have no liability for Buyer's failure to pay same.

4.      Closing Credit.  At closing, Seller agrees to issue to Buyer a credit against the 1.75% closing charge in the amount of $12,500.

5.      Flooring.  Section 15 is hereby revised to provide that all flooring installed in the Unit as of the date hereof shall remain in the Unit at closing. In addition, Seller agrees, at no

additional cost to Buyer, to install standard tile (24'' x 24'') in the color of Buyer's choice in all bathrooms in the Unit. Furthermore, Seller agrees, at no additional cost to Buyer, to install floor to ceiling standard tile (24'' x 24'') in the color of Buyer's choice in both showers in the Unit.

      6.   <u>Doors</u>. Section 15 is hereby further revised to provide that Seller will install, at no additional cost to Buyer, sliding doors connecting the media room to the second bathroom in the Unit, as more particularly depicted in <u>Exhibit B</u> attached hereto. In addition, Seller agrees, at no additional cost to Buyer, to replace the entry door to the Unit with_____. Seller agrees to provide renderings of the replacement entry door at the earliest possible date.

      7.   <u>Paint</u>. Section 15 is hereby further revised to provide that Seller will, at no additional cost to Buyer, paint the Unit with standard white paint.

      8.   <u>Valet and Concierge</u>. Seller hereby acknowledges that valet and concierge services will be provided as of the date of closing.

      9.   <u>Air Conditioning and Bathroom Accessories</u>. Seller hereby acknowledges that the Unit will have air conditioning, and the bathrooms in the Unit will be fitted with mirrors and wall sconces.

      10.   <u>No Rescission</u>. The execution of this Addendum shall neither extend, toll, nor reinstate any rights of the Buyer to rescind the Agreement pursuant to the terms thereof, or of Section 718.503(1)(a), Florida Statutes. Notwithstanding the foregoing, in the event that it is determined that the execution of this Addendum does serve to extend, toll or reinstate any rights of Buyer to rescind the Agreement pursuant to its terms or the terms of Section 718.503(1)(a), Florida Statutes, then Buyer expressly understands and agrees that any such rescission right shall only be effective and apply to the terms and provisions of this Addendum only and that the Agreement, as unmodified by this Addendum, shall remain in full force and effect.

      11.   <u>Release</u>. As an inducement to each Party entering into this Addendum, each Party represents and warrants to the other Party that to its knowledge, as of the date hereof, it does not have any claims, defenses, counterclaims or offsets under the Agreement. Furthermore, each Party hereby agrees and acknowledges that to its knowledge, as of the date hereof, the other Party is free from default under the terms of the Agreement.

      12.   <u>Ratification</u>. Except as expressly modified by this Addendum, the provisions of the Agreement remain in full force and effect and are hereby ratified and confirmed.

      13.   <u>Counterparts</u>. The Parties acknowledge and agree that this Addendum may be executed in separate or multiple counterparts, and transmitted via facsimile, each such counterpart (whether transmitted via facsimile or otherwise), when executed, shall constitute an integral part of one and the same agreement between the Parties and shall have the same validity as an originally executed Addendum.

14.     <u>Entire Agreement</u>.  This Addendum is the entire agreement of the Parties with respect to the subject matter hereof and can only be amended by a written instrument signed by the Party against whom enforcement is sought.

Wherefore, the Parties have set forth their hands and seals below this 5th   day of December, 2016.

**BUYER:**

**TULA E QUIJANO DE HERNANDEZ**

**SELLER:**

**PMG DRIFTWOOD, LLC**, a Florida limited liability company

By: _____
Name: Ryan Shear
Title: Authorized Representative

### ADDENDUM TO PURCHASE AGREEMENT

**THIS ADDENDUM TO PURCHASE AGREEMENT** (this "Addendum") amends, modifies, supplements and clarifies the terms and conditions of that certain Purchase Agreement (the "Agreement") of even date herewith, by and between **PMG DRIFTWOOD, LLC**, a Florida limited liability company ("Seller"), and **TULIA E. QUIJANO DE HERNANDEZ** ("Buyer"). Buyer and Seller are hereinafter referred to, individually, as a "Party," and, collectively, as the "Parties."

R E C I T A L S

WHEREAS, the Parties have executed the Agreement and related documents for the purchase and sale of Unit 2E in Sage Beach, a Condominium.

WHEREAS, the Parties desire to amend the Agreement in certain respects as more particularly set forth below.

NOW, THEREFORE, in consideration of the execution and delivery of this Addendum and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Recitals; Defined Terms.  The foregoing recitals are true and correct and are incorporated herein as if set forth herein at length.  Unless the context otherwise requires, all initial capitalized terms used but not defined in this Addendum shall have the meaning or meanings given to such terms in the Agreement.

2.    Assignment.  Paragraph 22 of the Agreement is hereby revised to reflect that Buyer may, without Seller's consent, assign its rights and obligations under the Agreement to any immediate family member, any trust for the benefit of Buyer and/or his immediate family members and/or any corporation, partnership or other entity the majority of which is beneficially owned by Buyer (or his immediate family members), or has common beneficial ownership with Buyer, prior to closing provided Buyer and its proposed assignee (a) execute and deliver to Seller an Assignment of Purchase Agreement in the form attached hereto as Exhibit A and (b) deliver to Seller the Articles of Organization, Bylaws or similar documents for the assignee entity establishing that one of the above requirements has been satisfied.

3.    HOA Fees.  At closing, Seller agrees to issue to Buyer a credit against the Purchase Price in the amount of $49,000.00 representing the estimated cost of twenty-four (24) months of condominium assessments for the Unit. It shall be Buyer's responsibility to pay such HOA fees directly to the Condominium association, and Seller shall have no liability for Buyer's failure to pay same.

4.    Closing Credit.  At closing, Seller agrees to issue to Buyer a credit against the 1.75% closing charge in the amount of $12,500.

5.    Flooring.  Section 15 is hereby revised to provide that all flooring installed in the Unit as of the date hereof shall remain in the Unit at closing. In addition, Seller agrees, at no

additional cost to Buyer, to install standard tile (24'' x 24'') in the color of Buyer's choice in all bathrooms in the Unit. Furthermore, Seller agrees, at no additional cost to Buyer, to install floor to ceiling standard tile (24'' x 24'') in the color of Buyer's choice in both showers in the Unit.

     6.   <u>Doors</u>.  Section 15 is hereby further revised to provide that Seller will install, at no additional cost to Buyer, sliding doors connecting the media room to the second bathroom in the Unit, as more particularly depicted in <u>Exhibit B</u> attached hereto. In addition, Seller agrees, at no additional cost to Buyer, to replace the entry door to the Unit with_____. Seller agrees to provide renderings of the replacement entry door at the earliest possible date.

     7.   <u>Paint</u>.  Section 15 is hereby further revised to provide that Seller will, at no additional cost to Buyer, paint the Unit with standard white paint.

     8.   <u>Valet and Concierge</u>.  Seller hereby acknowledges that valet and concierge services will be provided as of the date of closing.

     9.   <u>Air Conditioning and Bathroom Accessories</u>.  Seller hereby acknowledges that the Unit will have air conditioning, and the bathrooms in the Unit will be fitted with mirrors and wall sconces.

     10.   <u>No Rescission</u>.  The execution of this Addendum shall neither extend, toll, nor reinstate any rights of the Buyer to rescind the Agreement pursuant to the terms thereof, or of Section 718.503(1)(a). Florida Statutes. Notwithstanding the foregoing, in the event that it is determined that the execution of this Addendum does serve to extend, toll or reinstate any rights of Buyer to rescind the Agreement pursuant to its terms or the terms of Section 718.503(1)(a). Florida Statutes, then Buyer expressly understands and agrees that any such rescission right shall only be effective and apply to the terms and provisions of this Addendum only and that the Agreement, as unmodified by this Addendum, shall remain in full force and effect.

     11.   <u>Release</u>.  As an inducement to each Party entering into this Addendum, each Party represents and warrants to the other Party that to its knowledge, as of the date hereof, it does not have any claims, defenses, counterclaims or offsets under the Agreement. Furthermore, each Party hereby agrees and acknowledges that to its knowledge, as of the date hereof, the other Party is free from default under the terms of the Agreement.

     12.   <u>Ratification</u>.  Except as expressly modified by this Addendum, the provisions of the Agreement remain in full force and effect and are hereby ratified and confirmed.

     13.   <u>Counterparts</u>.  The Parties acknowledge and agree that this Addendum may be executed in separate or multiple counterparts, and transmitted via facsimile, each such counterpart (whether transmitted via facsimile or otherwise), when executed, shall constitute an integral part of one and the same agreement between the Parties and shall have the same validity as an originally executed Addendum.

14.    Entire Agreement.  This Addendum is the entire agreement of the Parties with respect to the subject matter hereof and can only be amended by a written instrument signed by the Party against whom enforcement is sought.

Wherefore, the Parties have set forth their hands and seals below this 5th   day of December, 2016.

BUYER:                                             SELLER:

PMG DRIFTWOOD LLC, a Florida
limited liability company

TULA E QUIJANO DE
HERNANDEZ

By:_____
Name: Ryan Shear
Title: Authorized Representative