IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABRAHAM EDGARDO ORTEGA,<br><br>*Defendant*. | Case No.: 1:18-cr-20685-KMW |

**STATEMENT OF THE BOLIVARIAN REPUBLIC OF VENEZUELA REGARDING MOTION OF DEFENDANT TO CONTINUE SENTENCING HEARING**

The Bolivarian Republic of Venezuela (the "Republic") submits this statement concerning Defendant's Motion To Continue Sentencing Hearing (Docket Entry 137). While the Republic takes no position on Defendant's Motion, it respectfully submits this statement to provide the Court with certain information relevant to the pending Motion to continue the sentencing hearing.

## BACKGROUND

Defendant Abraham Ortega ("Defendant") was charged by the United States ("Government") in a criminal complaint filed under seal on July 23, 2018. (Docket Entry 3) Defendant was arraigned on September 12, 2018. (Docket Entry 40) On October 24, 2018, the Government filed a one-count Superseding Information, charging Defendant with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) using property derived from specified unlawful activity. The specified unlawful activity consisted of a felony violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-3 and "an offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official." (Docket Entry 53)

1

On October 31, 2018, Defendant pled guilty to the Superseding Information (Docket Entry 61), entered into a Plea Agreement, and executed a Factual Proffer.  (Docket Entries 64 and 65)

According to the Factual Proffer, Defendant participated in bribery schemes devised to take advantage of the fact that "Venezuela had a foreign-currency exchange system under which the government [of Venezuela] would exchange local currency (Bolivars) at a fixed rate for U.S. Dollars," and "[t]he fixed exchange rate had been well below the true economic rate by a substantial factor."  Factual Proffer ¶ 1.  The Government and Defendant explain in the proffer that "[t]he difference between the fixed rate and the true economic rate created opportunity for fraud and abuse, enabling Venezuelan officials to engage in foreign currency exchange schemes in return for bribes and kickbacks."  *Id.* ¶ 3.  The Factual Proffer illustrates the opportunity for fraud and abuse with the following example:  In step one, a private person obtains 600 million Venezuelan Bolivars "at the true economic price" of 10 million US dollars, and in the second step, if the person is granted access to the "government fixed rate" by an authorized government official, the person can sell those 600 million Venezuelan Bolivars to the Republic at the "government fixed rate," receiving 100 million US dollars.  *Id.* ¶ 2.  In this illustration, the Republic has provided a 90 million US dollars benefit to the person selling Bolivars to the Republic at the "government fixed rate."

According to the Factual Proffer, Defendant held various finance positions at Petróleos de Venezuela, S.A. ("PDVSA"), the Republic's national oil company, and accepted bribes in exchange for acts and decisions in his official capacity which gave private persons access to the "government fixed rate."  *Id.* ¶¶ 6 and 9.  In one such scheme, "Company C" loaned PDVSA 17.4 billion Venezuelan Bolivars, and PDVSA repaid the loan in U.S. Dollars at "the

government fixed rate." *Id.* ¶ 14.  Using the exchange rate suggested by paragraph 2 of the Factual Proffer, this transaction amounted to a $2.6 billion subsidy.  According to the proffer, "Company C" obtained this subsidy through a "corrupt currency exchange scheme involving bribes," including a $10 million bribe to Defendant.  *Id.* ¶ 13.

Similarly, the Factual Proffer describes another criminal scheme in which "a company controlled by members of the conspiracy, ended up with the right to pay PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) and receive about 510 million Euros," *id.* ¶ 18, resulting in the theft of a subsidy from the Republic of approximately 475 million Euros, (more than $520 million at current Euro-Dollar exchange rates).

The Factual Proffer identifies these crimes as "[e]mbezzlement of public funds by a public official and bribery of a public official," which "was an offense against the nation of Venezuela." *Id.* ¶ 19.a.

On January 23, 2019, President Trump recognized Juan Guaidó as the legitimate representative of the Republic.  President Guaidó has duly appointed José Ignacio Hernández as Special Attorney General to represent and defend the interests of the Republic in legal proceedings outside of Venezuela, including this matter.

On April 2, 2019, a motion seeking victim status and restitution under the Crime Victims' Rights Act (18 U.S.C. § 3771) and the Mandatory Victims Restitution Act (18 U.S.C. §§ 3663A et seq.) was filed by attorneys purporting to represent the Republic of Venezuela under instruction of former Venezuelan President Nicolás Maduro.  *See* The Bolivarian Republic of Venezuela's Motion for Victim Status and Restitution (Docket Entry 87).  The motion stated that Defendant's scheme involved "the misappropriation, theft, and embezzlement of Venezuelan [government] funds." *Id.* at 9.

On May 17, 2019, the Government opposed the motion on the ground that it was filed under instructions of a person whom "the United States does not recognize" as having authority to speak on behalf of the Republic.  *See* Government's Response to the Bolivarian Republic of Venezuela's Motion for Victim Status and Restitution (Docket Entry 99 at 2).  The Government stated that "authority to recognize a foreign sovereign is exclusive to the Executive Branch. Here, the President of the United States has recognized the Venezuelan National Assembly and Interim President Juan Guaidó as the legitimate government and leader" of the Republic.  *Id.* at 1.  The Government also explained that "the decision to recognize a foreign power is a political question reserved for the President of the United States." *Id.* at 4-5 (citing and quoting *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015); *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 137-38 (1938); *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 675 (S.D. Fla. 1988)).

By letter dated May 22, 2019, Special Attorney General Hernández terminated the Republic's relationship with counsel who filed the motion and engaged lawyers at the law firm of Arnold & Porter Kaye Scholer LLP to represent the interests of the Republic in this matter. *See* Motion for Substitution of Counsel (Docket Entry 104).

On May 23, 2019, the Republic filed a stipulation of substitution of counsel, explaining that the Republic's proper, recognized authorities had determined that "the Republic would henceforth be represented solely by the law firm of Arnold & Porter Kaye Scholer, LLP."  *See* Joint Stipulation for Substitution of Counsel (Docket Entry 105 at 2).

Since that time, representatives of the Government and recognized representatives of the Republic, including Special Attorney General Hernandez and his designees, have been engaged in discussions concerning this and other matters with the goal of reaching an agreement that

would eliminate the need for an order by this Court on the pending motion for victim status and restitution.

Defendant is scheduled to be sentenced on September 12, 2019.

## **DISCUSSION**

As noted, the United States and the Republic are actively engaged in discussions to establish a government-to-government arrangement to provide for recovery by the Republic of the proceeds of bribery and corruption schemes and other criminal activity, such as that to which Defendant pled guilty. Such discussions are ongoing. One goal of these discussions is to eliminate the need for this Court to address the issue of restitution.

Further, although the Guaidó Administration has been recognized by the United States as the sole legitimate authority to represent the Republic, it does not have full access to the personnel and documents of the government and instrumentalities of the Republic at this time. To the contrary, the illegitimate Maduro group has refused to relinquish control of the operation of many organs of the Venezuelan government, including Petróleos de Venezuela, S.A. ("PDVSA"). Mr. Maduro has thus far refused to recognize the constitutional authority of Interim President Guaidó and the National Assembly and has instead unlawfully usurped the operations of the Venezuelan government.

Consequently, the Republic does not at this time have access to personnel, documents and other information that it needs to appropriately investigate the facts underlying the criminal offenses with respect to which the Defendant was indicted and has pled guilty and the broader conspiracy in which he was involved in order to establish its status as a victim and prove the amount of restitution, if any, that might be appropriate as a result of Defendant's crimes, to the extent that the Court agrees with the United States that the Republic bears the burden of proof on

matters concerning restitution.  At this time, the Republic would not be in a position to offer any evidence outside the Factual Proffer.

Dated: September 9, 2019

/s/ Jason A. Ross
Jason A. Ross (Florida Bar No. 59466)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
jason.ross@arnoldporter.com

*Attorney for the Bolivarian Republic of Venezuela*

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 9, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will deliver the document to all counsel of record.

Dated: September 9, 2019                         /s/ Jason A. Ross