# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABRAHAM EDGARDO ORTEGA,<br><br>*Defendant*. | Case No.: 1:18-cr-20685-KMW |

## MOTION OF PETRÓLEOS DE VENEZUELA, S.A FOR VICTIM STATUS AND RESTITUTION, AND INCORPORATED MEMORANDUM

Petróleos de Venezuela, S.A. (PDVSA) hereby moves, pursuant to 18 U.S.C. §§ 3663A, 3664, and 3771, and Federal Rules of Criminal Procedure 32 and 60, for an order recognizing PDVSA as a victim of the crime committed by Defendant Abraham Edgardo Ortega and an award of restitution from the Defendant in the amount of $560,033,118.19.

## MEMORANDUM

## BACKGROUND

On October 31, 2018, Defendant Abraham Edgardo Ortega pled guilty to a Superseding Information (DE 61) charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Ortega's plea was made pursuant to an agreement (DE 64), which was accompanied by a factual proffer detailing the circumstances of his crime (DE 65). The Plea Agreement anticipates and accepts that the Court "may order criminal forfeiture and restitution." (DE 64 ¶ 5; *see id.* ¶¶ 17, 18.)[1]

---

[1] While a forfeiture order has already been entered in this case, such orders do not preclude restitution, and indeed "a district court generally has no authority to offset a defendant's

*(footnote continued on next page)*

A.  **The Eaton-Rantor Loan Scheme Embezzled Hundreds of Millions of Dollars from PDVSA**

"The conspiracy in this case began in December 2014 with a currency exchange scheme to embezzle approximately 600 million U.S. Dollars from PDVSA." Aff. of Special Agent George F. Fernandez ("Fernandez Aff.") ¶ 30 (DE 3). PDVSA, Venezuela's state-owned oil and natural gas company, "is Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros)." Ortega Factual Proffer ¶ 4 (DE 65). The conspirators here, including Ortega, used PDVSA "as the source of foreign currency used to fund corrupt foreign exchange embezzlement schemes." *Id.*; Decl. of Special Agent Alan G. Vega ("Vega Decl.") ¶ 5 (DE 120-1).

While Ortega has admitted involvement in several fraudulent schemes that harmed PDVSA, this motion for simplicity focuses on what the United States Government ("Government") has referred to as the "Eaton-Rantor loan scheme." The heart of the Eaton-Rantor scheme arose from the fact that "Venezuela has a foreign-currency exchange system under which the [Venezuelan] government will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars," and "[t]he fixed exchange rate has been well below the true economic rate by a substantial factor for several years." Fernandez Aff. ¶ 19 (DE 3); Vega Decl. ¶ 3 (DE 120-1); *see* Ortega Factual Proffer, ¶ 1 (DE 65). "The difference between the fixed rate and the true economic rate creates opportunity for fraud and abuse." Fernandez Aff. ¶ 20 (DE 3); Vega Decl. ¶ 4 (DE 120-1). By way of illustration, "in 2014, an individual could exchange 10 million U.S. dollars for 600 million Venezuelan Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert the same 600 million Bolivars into 100

---

restitution obligation by the value of forfeited property held by the government." *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014).

million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars." Ortega Factual Proffer ¶ 2 (DE 65); Vega Decl. ¶ 3 (DE 120-1).

The Eaton-Rantor scheme took advantage of this discrepancy in the exchange rates, but with Euros rather than U.S. Dollars. The conspirators used shell companies to buy Bolivars at the "true economic rate," pretended to "loan" those Bolivars to PDVSA, and then got "repaid" at the special government fixed rate in Euros, rather than in Bolivars. In this way, the conspirators extracted hundreds of millions of Euros from PDVSA. (A Euro is worth about 1.1 U.S. Dollars at current exchange rates.) In particular, as the Government has explained, the co-conspirators used a "Hong Kong shell Company" named Eaton Global Services Limited and a "Venezuelan shell company" named Rantor Capital C.A. to create a "fake joint venture contract," which "contemplated a fictitious 600 million U.S. Dollar joint venture," for the ostensible purpose of "making of loans to PDVSA." Fernandez Aff. ¶¶ 41-42, 46 (DE 3); *see* Ortega Factual Proffer ¶ 18 (DE 65) ("In short, Eaton, a company controlled by members of the conspiracy, ended up with the right to pay PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) and receive about 510 million Euros….").

The money came from PDVSA. As the Government has explained, the Eaton-Rantor scheme was sourced with "PDVSA funds." Fernandez Aff. ¶ 46 (DE 3); *see* Vega Decl. Ex. A (DE 120-1). According to the Government, "fake joint venture" documents were used "to justify the movement of the PDVSA funds" to the conspirators. Fernandez Aff. ¶ 66 (DE 3). Ortega and other conspirators were recorded working to "distribute the PDVSA funds to themselves and others" and recounting the "receipt and expenditure of the PDVSA funds," *id.* ¶¶ 54, 58, and to "launder ORTEGA's portion of the PDVSA funds," *id.* ¶ 81. "Records obtained from email

search warrants confirm the flow of the PDVSA funds from PDVSA to the defendants and other conspirators," according to the Government. *Id.* ¶ 109; *see* Vega Decl. & Ex. A (DE 120-1) (tracing proceeds from PDVSA to assets of Ortega).

### B. Defendant Ortega Participated in the Eaton-Rantor Loan Scheme

During the relevant time period, Ortega was PDVSA's Executive Director of Financial Planning. While in that position, he participated in a series of "sophisticated false-investment schemes." Fernandez Aff. ¶ 18 (DE 3); *see* Ortega Factual Proffer ¶ 6 (DE 65). Ortega has admitted participating in the Eaton-Rantor conspiracy, which had as one of its objects the delivery of PDVSA's funds *to Ortega* as a bribe. See Ortega Factual Proffer ¶ 22.a (DE 65).[2] Ortega has also admitted that he took "a total of approximately 12 million U.S. Dollars . . . as a bribe payment in exchange for [his] corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at PDVSA." *Id.* ¶ 23. This admission was confirmed by other sources, such as a recording in which a confidential source said to another of the conspirators, "I mean, I didn't tell him, 'Look, this Ortega thing is a *kick-back*,' but I imagine that he knows what it is." Fernandez Aff. ¶ 90 (DE 3) (emphasis in original). Special Agents of Homeland Security Investigations have traced funds from the "Eaton-Rantor Loan Scheme" to Ortega. *See* Vega Decl. & Ex. A (DE 120 & 120-1).

### C. PDVSA Suffered Pecuniary Loss Exceeding $560 Million

The record indicates that the Government obtained documents reflecting "ten transfers from PDVSA from December 29, 2014 through February 3, 2015 totaling 511,913,270.74 Euros." Fernandez Aff. ¶ 109(a) (DE 3). (Those documents also record that the conspirator's

---

[2] Ortega also accepted bribes to assist legitimate business partners of PDVSA in obtaining "priority" status in apparently legitimate transactions, Ortega Factual Proffer ¶¶ 7-12 (DE 65), but, as noted at the outset, PDVSA focuses here on the Eaton-Rantor scheme.

4

"[c]ost" to obtain "the initial 7.2 billion Bolivars" was 36,905,664.87 Euros. *Id.* ¶ 109(b).) At the reported current Euro-Dollar exchange rate of 1.094 Dollars per Euro,[3] the amount of money extracted from PDVSA in U.S. dollars could be estimated as $560,033,118.19. For reasons described below, the recognized representatives of PDVSA do not have access to records in order to analyze the details of the transactions and therefore calculate the compensation owed to PDVSA, but instead rely on the statements of sworn statements of Special Agents of Homeland Security Investigations to support this motion.

### D. Recognition of Interim President Guaidó

On January 10, 2019, Nicolás Maduro was sworn in for a second term as President of Venezuela. However, Venezuela's "National Assembly declared Maduro's presidency illegitimate" and named Juan Guaidó as "Interim President of Venezuela," to serve until free and fair elections can be held. *Jiménez v. Palacios*, C.A. No. 2019-0490-KSJM, 2019 WL 3526479, at *3 (Del. Ch. Aug. 2, 2019).

That same day, the President of the United States officially recognized Mr. Guaidó. *See* The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), https://bit.ly/3bB933V. It has been a U.S. foreign policy priority to support the Guaidó government in restoring democracy, ending Maduro's corruption and human rights abuses, alleviating the humanitarian crisis gripping Venezuela, and eventually restoring economic prosperity and the rule of law to Venezuela. But for now, Maduro continues to maintain a hold

---

[3] *See* Dep't of Treasury, *Treasury Reporting Rates of Exchange: Current Rates* (Mar. 31, 2020), https://fiscal.treasury.gov/reports-statements/treasury-reporting-rates-exchange/current.html (0.9140 Euros to 1 U.S. Dollar).

on certain government bodies within Venezuela. Cong. Research Service, *Venezuela: Background and U.S. Relations*, at 6-8 (Nov. 7, 2019), www.fas.org/sgp/crs/row/R44841.pdf.

### E. The Recognized Representatives of the Republic Remove External PDVSA Assets From Maduro's Control

The Venezuelan National Assembly and Interim President Guaidó acted promptly to remove PDVSA's U.S.-based assets from Maduro's control. On February 5, 2019, the National Assembly enacted a statute to, among other things, define the powers of Interim President Guaidó. *See* Statute that Governs the Transition to Democracy to Reestablish the Full Force and Effect of the Constitution of the Bolivarian Republic of Venezuela (Democracy Transition Statute), Exhibit A to the Declaration of Kent A. Yalowitz.

The Democracy Transition Statute empowers the Interim President to "[a]ppoint *ad hoc* Administrative Boards" of state-owned corporations and other entities "for the purpose of appointing administrators and, in general, adopting the measures necessary to control and protect State company assets." *Id.* art. 15. It also directs the Interim President to appoint an ad hoc Administrative Board for PDVSA and regulates the PDVSA Administrative Board's authority. *Id.* art. 34.

On April 4, 2019, Interim President Guaidó exercised his constitutional and statutory authority under the Democracy Transition Statute to issue Presidential Decree No. 3, which grants "new powers and duties" to the PDVSA Administrative Board for the purpose of "protect[ing] Venezuelan State assets abroad, directly or indirectly controlled by PDVSA." *See* Exhibit B to the Declaration of Kent Yalowitz. These new powers include, for example, the power to "legally represent PDVSA and its subsidiaries abroad," "in coordination with the Special Attorney appointed by the Interim President of the Republic." *Id.* art. 5.

Courts in the United States must recognize actions taken pursuant to these Venezuelan laws by the National Assembly and Interim President Guaidó as controlling. *See* Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044 (D.C. Cir. May 1, 2019) (per curiam), Doc. No. 1785518 ("The executive branch's action in recognizing a foreign government is conclusive on all domestic courts, which are bound to accept that determination." (ellipsis and quotation marks omitted)); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 n.2 (3d Cir. 2019); *Crystallex Int'l Corp. v. PDV Holding Inc.*, No. 15-CV-1082-LPS, 2019 WL 6785504, at *3 n.9 (D. Del. Dec. 12, 2019); *Jiménez*, 2019 WL 3526479, at *10-11; *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16-cv-1533, 2019 WL 2185040, at *4-5 (D.D.C. May 21, 2019); *see also* Statement of Interest of the United States at 3, *Impact Fluid Sol'ns LP v. Bariven SA*, No. 4:19-cv-652 (S.D. Tex. Jan. 31, 2020), Dkt. 43 ("[T]he United States Government has recognized Guaidó as the Interim President of Venezuela. Accordingly, Guaidó and those appointed by him have authority to speak on behalf of the Bolivarian Republic of Venezuela in the United States.").

Accordingly, in *Jiménez v. Palacios*, C.A. No. 2019-0490-KSJM, 2019 WL 3526479, the Delaware Chancery Court confirmed that the PDVSA Administrative Board had properly taken control of PDVSA's largest commercial U.S. asset, the holding companies that control Citgo Petroleum Corporation.

### F. The Charges Against Ortega and the Republic's Motion for Restitution

On October 24, 2018, the Government filed a one-count Superseding Information, charging Ortega with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), using property derived from specified unlawful activity. The conspiracy's unlawful activity was "[a]n offense against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public

7

official," as well as a violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-3. (DE 53 at 1-2.) On October 31, 2018, Defendant pled guilty to the Superseding Information (DE 61), entered into a Plea Agreement (DE 64.) As noted above, the Plea Agreement anticipates and accepts that the Court may order restitution. (*Id.* ¶¶ 5, 17, 18.)

On April 2, 2019, attorneys purporting to represent the Bolivarian Republic of Venezuela under instruction from Maduro filed a motion seeking victim status and restitution under the Crime Victims' Rights Act (CVRA) and the Mandatory Victims Restitution Act (MVRA). (DE 87.) The Government opposed the motion on the ground that it was filed under instructions of a person whom "the United States does not recognize" as having authority to speak on behalf of the Republic. (DE 99 at 2.) The Government stated that "authority to recognize a foreign sovereign is exclusive to the Executive Branch. Here, the President of the United States has recognized the Venezuelan National Assembly and Interim President Juan Guaidó as the legitimate government and leader" of the Republic. (*Id.* at 1.) The Government also explained that "the decision to recognize a foreign power is a political question reserved for the President of the United States." *Id.* at 4-5 (citing and quoting *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015); *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 137-38 (1938); *Republic of Panama v. Air Panama Internacional, S.A.* 745 F. Supp. 669, 675 (S.D. Fla. 1988)).

On May 23, 2019, the Republic filed a stipulation of substitution of counsel, explaining that the Republic's proper, recognized authorities had determined that "the Republic would henceforth be represented in this case solely by the law firm of Arnold & Porter Kaye Scholer, LLP." (DE 105 at 2 (quotation marks omitted.)

Today, the Republic is filing an application to withdraw its motion for restitution as superseded by the present motion.

## STANDARD OF REVIEW

"[W]hether petitioners [under the CVRA] are victims of the criminal conduct as described in the [charging document] . . . is a mixed question of law and fact." *In re Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008) (per curiam). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

## ARGUMENT

PDVSA is a victim of Ortega's offense for purposes of the Mandatory Victims Restitution Act (MVRA) and the Crime Victims' Rights Act (CVRA), and it is entitled to restitution under the MVRA.

### I.  PDVSA IS A VICTIM OF DEFENDANT'S OFFENSE UNDER THE MVRA AND CVRA

The MVRA and the CVRA create legal rights and protection for crime victims, including by specifying procedures for awarding restitution as a mandatory component of the sentence upon conviction of certain criminal offenses. *See* 18 U.S.C. § 3663A(a)(1) ("[T]he court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense."). Both laws define a "victim" as "a person directly and proximately harmed as a result of the commission of" a specified offense. 18 U.S.C. § 3663A(a)(2) (MVRA); 18 U.S.C. § 3771 (CVRA). The MVRA also provides that, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim "include[s] . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* § 3663A(a)(2). This language "broadens the definition of the term 'victim.'" *United States v. Maturin*, 488 F.3d 657, 662 (5th Cir. 2007); *see also United States v. Edwards*, 728 F.3d 1286, 1293 (11th Cir. 2013) (Eleventh Circuit has

9

"repeatedly rejected attempts to narrow the scope of 'victim' under the statute," and will consider even uncharged criminal conduct in assessing who is a victim (quoting *United States v. Brown*, 665 F.3d 1239, 1253 (11th Cir. 2011)); *United States v. Dickerson*, 370 F.3d 1330, 1343 (11th Cir. 2004).

Corporate victims are eligible under these statutes, *see United States v. Collins*, 854 F.3d 1324, 1328 (11th Cir. 2017) (affirming restitution to Wells Fargo from former employee), as are foreign persons, *see United States v. Naphaeng*, 906 F.3d 173, 175 (1st Cir. 2018) (affirming restitution to foreign nationals). PDVSA is thus eligible. It makes no difference that PDVSA's sole shareholder is the Republic. The Supreme Court has long instructed that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status," as a matter of "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations." *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983); *see GSS Group Ltd v. National Port Authority*, 680 F.3d 805, 817 (D.C. Cir. 2012) (a state-owned firm is "a separate 'person' entitled to due process protection"); *see also* 1 U.S.C. § 1 ("person" in federal statute "include[s] corporations"). It is well established, moreover, that government entities are eligible for restitution, *e.g.*, *United States v. Washington*, 434 F.3d 1265, 1268 (11th Cir. 2006), and foreign sovereigns in particular have been awarded restitution, *e.g.*, *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011) (Republic of South Africa); *see also* U.S. Dep't of Justice, *Attorney General Guidelines for Victim and Witness Assistance* 12 (2012) (foreign governments "may qualify for restitution under federal restitution statutes").

Here, PDVSA was "directly and proximately harmed" by the commission of the offense to which Ortega pled guilty and by Ortega's conduct. The record shows that Ortega, then an executive of PDVSA, conspired to embezzle hundreds of millions of dollars from PDVSA and

10

launder the proceeds. *Supra* pp. 1-5. Ortega accepted $12 million in bribes and was slated to get even more when the authorities stepped in; in exchange, he manipulated the levers of PDVSA from within to channel fake "loan repayments" to shell companies in order to extract money from PDVSA. Ortega Factual Proffer, ¶¶ 15-18, 23 (DE 65); *see also* Fernandez Aff. ¶¶ 56, 61, 64, 81 (DE 3) (describing evidence that Ortega received share of embezzled PDVSA funds).

Courts in this Circuit routinely accord victim status and order the payment of restitution to organizations whose rogue employees and officers—like Ortega—have embezzled from them or have otherwise unlawfully diverted their funds. In *United States v. Ramdeo*, 682 F. App'x 751 (11th Cir. 2017), for example, a corporation's payroll manager, who had been tasked with paying the corporation's payroll taxes during a period of financial distress, hired his own sham tax-assistance company with the purported purpose of helping the company make timely payments. *Id.* at 753. The manager diverted over $22 million in corporate funds to the fake company and used those funds to start and operate his own charter airline, meanwhile using external bank accounts to launder the funds. *Id.* The district court awarded over $21 million in restitution to the victim corporation, and the Eleventh Circuit affirmed. *Id.* at 758. Similar fact patterns—involving organizations defrauded by their employees—are common. *See, e.g. United States v. Futrell*, 209 F.3d 1286, 1290-91 (11th Cir. 2000) (restitution to Tennessee Valley Authority from former employee convicted of conspiring to make false statements in connection with receipt of disability benefits); *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010) (restitution to credit union from employee convicted of embezzlement); *United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (restitution to nonprofit organization from state senator who traded kickbacks for state contracts).

To be sure, a corporation can be denied restitution where it "was a *knowing participant* in the very offense for which the defendant was ordered to pay restitution, sharing the goals of the defendant." *United States v. Emor*, 850 F. Supp. 2d 176 (D.D.C. 2012) (emphasis added) (citations omitted). For example, in *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234 (11th Cir. 2014), Wellcare was denied victim status because Wellcare *itself* defrauded others of approximately $40 million. *Id.* at 1236. The Eleventh Circuit affirmed the denial of restitution because "Wellcare admitted that it was a co-conspirator in the underlying fraudulent conduct" and even "paid restitution and forfeited assets as a result of its participation in the criminal offenses." *Id.* at 1239. But here, in contrast, the end and aim of the Eaton-Rantor conspiracy was to extract money *from* PDVSA.

Accordingly, PDVSA is a victim of Ortega's offense.

## II. PDVSA IS ENTITLED TO MANDATORY RESTITUTION UNDER THE MVRA

PDVSA meets all requirements for mandatory restitution under the MVRA: [1] it is the victim of a qualifying offense [2] "in which an identifiable victim or victims has suffered . . . pecuniary loss." 18 U.S.C. § 3663A(c). This Court should therefore enter an order of restitution in the full amount of the funds unlawfully appropriated from PDVSA or, in the alternative, should set a hearing at which the proper amount of restitution can be established.

### A. Defendant's Offense Triggers Mandatory Restitution Under the MVRA

The MVRA requires restitution for the victims of certain crimes, with the "primary and overarching purpose" to "make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *Collins*, 854 F.3d at 1329. The mandatory restitution scheme applies to any "offense against property" under Title 18, "including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii).

Ortega's offense qualifies. Ortega pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), with the particular object of the conspiracy being to launder funds "derived from a specified unlawful activity," in violation of § 1957(a). (DE 53; DE 64.) As a general matter, money laundering offenses under § 1956 and § 1957 trigger mandatory restitution. *See, e.g. United States v. Luis*, 765 F.3d 1061, 1064 (9th Cir. 2014).

Moreover, the "specified unlawful activity" underlying Ortega's money laundering offense was "[a]n offense against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official." (DE 53 at 2.) These sorts of offenses—where the perpetrators "intentionally derive[] an unlawful pecuniary gain by taking property belonging to [another party]"—necessarily qualify as offenses against property under the MVRA. *See Collins*, 854 F.3d at 1335 (citing *Black's Law Dictionary* 454 (10th ed. 2014)); *see also, e.g. Edwards*, 728 F.3d at 1289 (mail fraud, wire fraud, and money laundering); *Futrell*, 209 F.3d at 1290-91 (conspiracy to make false statements to obtain disability benefits).

### B. PDVSA Suffered Pecuniary Loss

Ortega's offense was also one for which "an identifiable victim or victims suffered . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). As the Government has explained, the conspiracy in this case was a "scheme to embezzle approximately 600 million U.S. Dollars from PDVSA." Fernandez Aff. ¶ 30 (DE 3). The Eaton-Rantor scheme took advantage of exchange-rate discrepancies by using shell companies to (1) buy 7.2 billion Bolivars at the "true economic rate," (2) pretend to "loan" those Bolivars to PDVSA in sham transactions, and then (3) get "repaid" at the special government fixed rate in Euros, rather than in Bolivars. *Id.* ¶¶ 41-42, 46; Ortega Factual Proffer ¶ 18 (DE 65).

As the Government has explained, the Eaton-Rantor scheme "was disguised as a 'financing' arrangement" sourced with "PSVSA funds." Fernandez Aff. ¶ 46 (DE 3). According to the Government, "fake joint venture" documents were used "to justify the movement of the PDVSA funds" to the conspirators. *Id.* ¶ 66. Ortega and other conspirators were caught red-handed working to "distribute the PDVSA funds to themselves and others," *id.* ¶ 54, recorded their 'receipt and expenditure of the PDVSA funds," *id.* ¶¶ 58, and agreed to "launder ORTEGA's portion of the PDVSA funds," *id.* ¶ 81. "Records obtained from email search warrants confirm the flow of the PDVSA funds from PDVSA to the defendants and other conspirators." *Id.* ¶ 109.

Because the Eaton-Rantor scheme caused a pecuniary loss to PDVSA, the MVRA requires the Court to "order restitution to each victim in the full amount of [the] victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

## III. RESTITUTION OF AT LEAST $560,033,118.19 SHOULD BE ORDERED

The loss calculation here is straightforward. When "a defendant's conduct was permeated with fraud," the proper "starting point for calculating the victim's pecuniary harm" is "the amount that was transferred from the victim to the fraudulent enterprise." *Campbell*, 765 F.3d at 1305; *accord United States v. Foster*, 878 F.3d 1297, 1306 (11th Cir. 2018). With respect to the Eaton-Rantor scheme, the amount transferred from PDVSA is at least 511,913,270.74 Euros. At current Euro-Dollar exchange rates, that amount is $560,033,118.19.

### A. No Offset Should Be Permitted

In some cases, "value may be rendered even amid fraudulent conduct," permitting an offset for "the fair market value of the returned money or the services rendered." *Foster*, 878 F.3d at 1306 (quoting *Campbell*, 765 F.3d at 1302). "But a defendant is not entitled to receive

credit for returning money if his sole purpose in doing so is 'to conceal or perpetuate his scheme.'" *Id.* (quoting *Campbell*, 765 F.3d at 1302). Thus, in *Foster*, the defendant was not entitled to credit for real estate contracts that he sold to his victims as part of a sham investment scheme, even if they had some opportunity to attempt to salvage real economic value from the contracts. *Id.* Similarly, in *United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998), the court held that fraudulent telemarketers "were not entitled to a credit for the refunds they purportedly gave to some" victims. *Id.* at 1012. While the court recognized that "value may be rendered even amid fraudulent conduct," the cash refunds "did not constitute legitimate services rendered to [victim] customers. Instead, they were a part of [the] fraudulent scheme," because the conspirators' return of money to victims "was done for the sole purpose[] of deflecting serious disruption of their schemes and making the operation look legitimate." *Id.* (quotation marks omitted).

Here, it is true that the conspirators provided PDVSA with 7.2 billion Bolivars, which they acquired at a cost (reflecting true economic value) of 36,905,664.87 Euros. But there should be no offset of the 37 million Euros, because the conspirators' delivery of that money to PDVSA was done for the sole purpose of "making the operation look legitimate." *Blitz*, 151 F.3d at 1012. As a result, no offset should be permitted.

### B.  Joint and Several Liability Would Be Appropriate

Ortega may argue that he should not be responsible for the entire loss amount because he is one of several co-conspirators who harmed PDVSA. The MVRA, however, "specifically contemplates joint and several liability," so that apportionment is available, but not necessary. *United States v. Puentes*, 803 F.3d 597, 605 (11th Cir. 2015); *see* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic

15

circumstances of each defendant."). Given Ortega's position as PDVSA's Executive Director of Financial Planning, his role in the conspiracy, and the payments he personally received, it is within the Court's discretion to hold him jointly and severally responsible for the total loss.

### C. The Court May Hold a Hearing to Resolve Disputed Issues of Material Fact

To the extent that there is any doubt about the facts, this Court may conduct an evidentiary hearing to determine on the amount of restitution owed. *See* 18 U.S.C. § 3664(e); Fed. R. Crim. P. 60(a)(3). If the presentence investigation report in this case—which PDVSA does not have access to—fails to include the amount of PDVSA's losses, this Court prior to the sentencing hearing must direct the Probation Office "to obtain and include in its presentence report . . . information sufficient for the court to" estimate those losses. 18 U.S.C. § 3664(a). The MVRA also entitles PDVSA, as a victim, to put forward evidence of its own losses. *Id.* § 3664(d)(2)(A)(iii) (Probation Office must ensure "the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses"). And if the Court determines that PDVSA's losses "are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." *Id.* § 3664(d)(5).

### CONCLUSION

This Court should rule that PDVSA is a victim of Ortega's offense under the CVRA and MVRA. This Court should further enter an order of restitution in the full amount of PDVSA's losses ascertainable from the record or, in the alternative, should set a restitution hearing prior to, or at the time of, sentencing in this case. Any restitution should be ordered paid to PDVSA under the direction of its ad hoc board, *see supra* p. 6, and any payments of such restitution should be made to an account controlled by the ad hoc board.

Dated: April 24, 2020

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

*/s/ Jason A. Ross*
Jason A. Ross (Florida Bar No. 59466)
601 Massachusetts Ave., N.W.
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
jason.ross@arnoldporter.com

and

Kent A. Yalowitz (*pro hac vice* pending)
250 West 55th Street
New York, NY 10019
Telephone: +1 212.836.8344
kent.yalowitz@arnoldporter.com

*Attorneys for the Bolivarian Republic of Venezuela*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will deliver the document to all counsel of record.

Dated: April 24, 2020

*/s/ Jason A. Ross*
Jason A. Ross