**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-CR-20685-WILLIAMS**


**UNITED STATES OF AMERICA**


**vs.**


**ABRAHAM EDGARDO ORTEGA,**

             **Defendant.**
_____/


**GOVERNMENT'S RESPONSE IN OPPOSITION TO PDVSA'S**
**MOTION FOR VICTIM STATUS AND RESTITUTION**

The United States, through undersigned counsel, hereby responds to third-party claimant Petróleos de Venezuela, S.A. ("PDVSA")'s Motion for Victim Status and Restitution, and Incorporated Memorandum.[1] DE 191. PDVSA's motion should be denied because: (1) PDVSA, a state-owned instrumentality, does not qualify as a victim under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771; (2) PDVSA's complicity in the bribery and money laundering schemes that are the subject of this prosecution preclude it from being treated as a victim under both the CVRA and Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A; and (3) PDVSA is not entitled to restitution under the MVRA for any alleged harm resulting from conduct that was not charged or for alleged harms not directly and proximately caused by Defendant Abraham Edgardo Ortega's ("Defendant") criminal conduct.

PDVSA's alternative request for a "restitution hearing," DE 191:16, should be denied as well. PDVSA's request under 18 U.S.C. § 3664(e) is based on the erroneous presumption that it

---

[1]  The United States does not dispute the standing of PDVSA's ad hoc managing board, as appointed by Interim President Juan Guaidó, or its legal representatives to bring its Motion for Victim Status and Restitution.

1

has already been found to be a victim entitled to restitution.  But, as explained in greater detail below, no further evidentiary showing is necessary to determine that PDVSA is not entitled to victim rights because it participated in the pervasive corrupt conduct and because it is unable to show a direct and proximate causal link between this Defendant's conduct and any harm allegedly suffered by PDVSA.  PDVSA's motion should be rejected in its entirety.[2]

## LEGAL STANDARDS

"[W]hether petitioners [under the CVRA] are victims of the criminal conduct as described in the [charging document] . . . is a mixed question of law and fact."  *In re Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008) (per curiam).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).

The enforcement provision of the MVRA "allocates the various burdens of proof among the parties who are best able to satisfy those burdens and who have the strongest incentive to litigate the particular issues involved."  *See United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998).  Although "[i]t might appear to the casual observer that § 3664(e) places the burden of proof on the government on all issues relating to loss to the victim . . . the burden section of the statute only requires the government to establish 'the amount of loss sustained by [the] victim.'"

---

[2] An evidentiary hearing is particularly unwarranted here, where PDVSA has acknowledged that it presently has no more evidence to present in support of its claim for victim status and its motion relies on facts already contained within the record.  Specifically, its motion explains that "the recognized representatives of PDVSA do not have access to records in order to analyze the details of the transactions" in part because former President Nicolas Maduro Moros ("former President Maduro") "continues to maintain a hold on certain government bodies within Venezuela," in particular PDVSA.  DE 191:5-6; *see also* Cong. Research Service, Venezuela: Background and U.S. Relations, 5 (Nov. 7, 2019), www.fas.org/sgp/crs/row/R44841.pdf.  Absent former President Maduro relinquishing control to allow for free and fair legislative and presidential elections in Venezuela, the current recognized representatives' access to further evidence is unlikely to change any time in the near future.  Thus, to undertake an evidentiary hearing in this matter, with all the attendant foreign policy implications, is likely to "complicate and prolong the sentencing to a degree that the need to provide restitution to any victim is outweighed by the burden of the sentencing process."  18 U.S.C. § 3663A(c)(3)(b).  Under those circumstances, the MVRA instructs that "restitution need not be provided."  *Id.*

*Id.* (quoting *United States v. Razo-Leora,* 961 F.2d 1140, 1146 (5th Cir. 1992)).  In fact, the statute explicitly provides that "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e).  Accordingly, the government submits that, as the movant here, PDVSA bears the burden of proof that it is entitled to victim status under the CVRA and MVRA.

## FACTUAL BACKGROUND

### A.    PDVSA

PDVSA is Venezuela's state-owned and state-controlled oil company.  According to PDVSA's Spanish-language website, the Venezuelan government is PDVSA's sole stockholder. *Legal Framework* and *History*, *PDVSA*, *http://www.pdvsa.com/index.php?lang=es* (last visited Apr. 23, 2020) (translated) ("Organic Law. . . reserves to the State goods and services related to primary hydrocarbon activities" and "PDVSA and its subsidiaries [are] a Corporation property of the Bolivarian Republic of Venezuela, subordinated to the Venezuelan State").  PDVSA's mission is "[t]o value [its] natural hydrocarbon resources for the benefit of the nation;" "[s]upport the geopolitical positioning of Venezuela internationally;" and "[t]o be an instrument for the endogenous development of Venezuela." *Id.* at Strategic Guidelines (translated).  At all times during the relevant time period, PDVSA's operations were controlled by the Ministry of Petroleum and the Board of Directors, as appointed by former Venezuelan President Hugo Rafael Chávez Frías and former President Maduro.

### B.    Criminal Proceedings in the United States and Elsewhere

For nearly a decade, United States authorities have investigated and prosecuted several individuals in separate ongoing bribery and money laundering investigations involving PDVSA and its wholly owned subsidiaries.  To date, the United States has announced charges against 15

bribe-paying PDVSA contractors, 11 bribe-receiving PDVSA officials, and 5 intermediaries.  To date, 12 bribe-paying PDVSA contractors, 8 bribe-receiving PDVSA officials, and 1 intermediary have pleaded guilty in connection with the United States' ongoing investigations into corruption at PDVSA.  The public filings in each of these cases detail the scope of the multi-year, multi-million dollar schemes in which these defendants participated.  For example:

- Abraham Edgardo Ortega, the Defendant in this case and the former Executive Director of Financial Planning for PDVSA, pleaded guilty to a money laundering conspiracy, wherein he admitted to receiving and laundering $12 million in connection with two separate corruption schemes occurring in 2012 and between 2014 and 2015, respectively.  DE 65.

- Edoardo Orsoni, former General Counsel of PDVSA and one of its subsidiaries, was charged by information for a conspiracy spanning from 2012 until 2016 alleging that he received instructions from senior PDVSA officials to ensure that specific contractors received contracts from the subsidiary which ultimately yielded benefits for those senior PDVSA officials.  *United States v. Edoardo Orsoni*, Case 1:19-cr-20725-MGC, (S.D. Fla. Nov. 4, 2019, Information, DE 3:4).

- Abraham Shiera and Roberto Rincon pleaded guilty to conspiring to obtain PDVSA contracts worth millions of dollars by bribing multiple PDVSA officials, including officials of PDVSA subsidiaries Bariven, S.A., ("Bariven") and PDVSA Services, Inc., ("PSI"), between 2009 and 2014.  *United States v. Roberto Enrique Rincon Fernandez, Abraham Jose Shiera Bastidias*, Case No. 4:15-cr-654 (S.D. Tex. Dec. 10, 2015 Indictment, DE 1, and June 15, 2016, Information, DE 61).

- Jose Luis Ramos, former Purchasing Manager and Superintendent of Purchasing for PDVSA, admitted to receiving and laundering, on behalf of himself and other officials, more than $10 million in bribe proceeds in exchange for assisting multiple vendors in their business with PDVSA between 2009 and 2013.  *United States v. Jose Luis Ramos*, Case No. 4:15-cr-636 (S.D. Tex. Dec. 3, 2015 Plea Agreement, DE 15).

- Two former high-ranking officials with PDVSA's procurement subsidiary, Bariven—Javier Alvarado Ochoa and Cesar Rincon, the former President and the former General Manager of Bariven, respectively—were also indicted in connection with their roles in an extensive bribery and money laundering scheme.  *United States v. De Leon et al.*, Case No. 4:17-cr-514-S (S.D. Tex. Apr. 24, 2019, Indictment, DE 1 and Superseding Indictment, DE 129).  Cesar Rincon pleaded guilty to conspiring to launder money—specifically proceeds of the bribery scheme in which Roberto Rincon and Abraham Shiera paid high-level executives of Bariven in exchange for certain business advantages.  *United States v. Cesar David*

*Rincon-Godoy*, Case No. 4:17-cr-514 (S.D. Tex. Aug. 23, 2017 Indictment, DE 1). Luis Carlos De Leon, an intermediary who was indicted as part of the same scheme, also pleaded guilty in connection with his role in the scheme, which involved more than $27 million wired to Swiss bank accounts for the benefit of PDVSA officials in exchange for the officials' assistance with Roberto Rincon's and Abraham Shiera's business with PDVSA. *United States v. Luis Carlo De Leon*, Case No. 4:17-cr-514 (S.D. Tex. July 12, 2018, Information, DE 96).

- Ivan Guedez, the Purchasing Manager for PSI, pleaded guilty to a criminal information alleging that between approximately 2009 and 2013 he received bribes from a Miami, Florida based vendor in its business as a sole source provider to PDVSA of heavy equipment manufactured by another company in the United States. In sum, Guedez received over $950,000 in bribe payments part of the bribery scheme. *United States v. Ivan Alexis Guedez*, Case No. 18-cr-611 (S.D. Tex. Sept. 12, 2018, Information, DE 1). Franz Muller and Rafael Pinto, the President and Sales Manager at the Miami, Florida based company, respectively, both admitted paying bribes to Guedez, Jose Camacho, another official, and at least one other PSI official as part of this scheme. *United States v. Franz H. Muller-Huber*, Case No. 19-cr-135 (S.D. Tex. July 18, 2019, Pinto Information, DE 45; Aug. 9, 2019, Muller Information, DE 55).

- Jose Manuel Gonzalez Testino pleaded guilty to a criminal information that alleged that he paid approximately $629,000 in bribes to Cesar Rincon while he was the General Manager of Bariven, and that he paid over $1 million in bribes to officials at Citgo Petroleum Corporation, a wholly owned subsidiary of PDVSA. *United States v. Jose Manuel Gonzalez Testino*, Case No. 19-cr-341 (S.D. Tex. May 14, 2019, Information, DE 36). One of Gonzalez's business partners, Tulio Farias, pleaded guilty to a criminal information that alleged that between 2011 and 2018, Farias conspired to pay approximately $575,000 to an official at Citgo. *United States v. Tulio Anibal Farias-Perez*, Case No. 20-cr-89 (S.D. Tex. Feb. 7, 2020, Information, DE 1).

Furthermore, on January 28, 2019, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") added PDVSA to its Specially Designated Nationals and Blocked Persons List, noting what the criminal investigations have made apparent, that PDVSA "has long been a vehicle for corruption." This designation prohibits U.S. persons "from engaging in transactions or dealings" with PDVSA in the absence of a license issued by OFAC. *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019) (cited as "January 2019 Treasury Press Release")

(available at https://home.treasury.gov/news/press-releases/sm594).  As of the date of this motion,

PDVSA remains a sanctioned entity.

In addition to the United States, numerous countries throughout the world have opened

investigations and prosecutions into corrupt conduct at PDVSA.  For example, according to open-

source information, the following authorities appear to have investigations and/or prosecutions

relating to PDVSA-linked corruption:

- Spain has opened multiple investigations relating to PDVSA, including an
investigation regarding Juan Carlos Marquez (deceased), a former PDVSA
executive for a 4.5 million Euro money laundering scheme between 2008 and
2013 involving fictitious legal contracts between PDVSA and two law firms.
Jose Antonio Hernandez and Jose Mario Irujo, *Spain opens investigation into
suicide of former Venezuelan oil chief*, Jul. 29, 2019, https://english.
elpais.com/elpais/2019/07/29/inenglish/1564393060_129549.html.  Spain also
has a money laundering investigation relating to Javier Alvarado Ochoa, the
former President of Bariven (discussed above), and for whom the Spanish
authorities have denied extradition to the United States.  Associated Press, Dec.
17, 2019, *Spain's National Court Has Rejected the Extradition to the United
States of a Former Venezuelan Minister Wanted by the U.S. for Money
Laundering Linked to Venezuela's PDVSA State Oil Company*,
https://www.wtvq.com/2019/12/17/spanish-court-refuses-to-extradite-
venezuelan-ex-minister/.  Finally, Spain is also investigating Venezuelan
billionaire Raul Gorrin (also under indictment in the United States for a separate
money laundering scheme involving the Venezuelan Treasury) for his role in a
money laundering scheme involving PDVSA.  Associated Press, Feb. 20, 2020,
*Spanish judge summons Venezuelan TV owner in PDVSA probe*,
https://www.seattletimes.com/business  /spanish-judge-summons-venezuelan-
tv-owner-in-pdvsa-probe/.

- Portugal is investigating alleged money laundering of funds that were
channeled through now-defunct Portuguese bank Banco Espirito Santo between
2009 and 2014, by PDVSA officials.  Brian Ellsworth, Jun. 24, 2017, *Portugal
investigating fraud linked to Venezuela PDVSA funds, PDVSA says*,
https://www.reuters.com/article/us-venezuela-pdvsa-idUSKBN19F0SL.

- Andorra charged numerous Venezuelan officials in a money laundering probe
involving PDVSA.  British Broadcasting Corporation, Sep. 14, 2018,
*Venezuelan ex-officials charged in Andorra over $2.3bn graft scheme*,
https://www.bbc.com/news/world-latin-america-45507588.

6

- Switzerland's financial supervisory authority, FINMA, is investigating the roles played by employees at Julius Baer Bank in connection with the laundering of approximately $1.2 billion linked to PDVSA.  Paula Dupraz-Dobias, Apr. 29, 2020, *Swiss oil traders and banks burned by Venezuela ties*, https://www.swissinfo.ch/eng/us-sanctions-_swiss-oil-traders-and-banks-burned-by-venezuela-ties/45722290.

- Lichtenstein is investigating a Swiss banker involved in PDVSA money laundering.  Finews, Feb. 26, 2020, *Liechtenstein Probes Swiss Banker*, https://www.finews.com/news/english-news/40106-liechtenstein-money-laundering-criminal-investigation-matthias-krull-pdvsa-julius-baer.

- New Zealand is investigating money laundering transactions involving 17 million U.S. dollars by the wife of a PDVSA official.  Jared Savage, Dec 23, 2019, *More than $17m transferred from Bahamas to NZ bank account following corruption, money laundering scandal in Venezuela oil company*, https://www.nzherald.co.nz/nz/news/article.cfm?c_id=1&objectid=12292587.

## ARGUMENT

### A. PDVSA Is Not Entitled to the Rights of a Victim Under the CVRA Because the CVRA's Definition of Victim Does Not Include a State-Owned Instrumentality of a Foreign Government

At the outset, PDVSA's application pursuant to the CVRA fails because it is not a victim of the Defendant's crime under the CVRA.  The CVRA defines a crime "victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e)(2)(A).  The Supreme Court has long held that when Congress uses the word "person" in a federal statute, absent some "affirmative showing of statutory intent to the contrary" there is a presumption that "'person' does not include the sovereign."  *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780-81 (2000).  That interpretative presumption is grounded in part in the language of the Dictionary Act, 1 U.S.C. § 1, which provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  Numerous courts have concluded that the absence

of government entities from the Dictionary Act's definition of "person" indicates that, absent some express provision to the contrary, Congress did not mean to include government entities, such as cities, states, the United States, or foreign nations. For example, in *United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947), the Supreme Court observed the following with respect to the Norris-LaGuardia Act:

> The Act does not define "persons." In common usage that term does not include the sovereign, and statutes employing it will ordinarily not be construed to do so. Congress made express provision, 1 U.S.C. § 1, for the term to extend to partnerships and corporations, and in § 13 of the Act itself for it to extend to associations. The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them.

*Id.* at 275; *see also, e.g., United States v. Errol D.*, 292 F.3d 1159, 1162-64 (9th Cir. 2002) (holding that the Bureau of Indian Affairs, as a government agency, was not a "person" under the Indian Major Crimes Act). Indeed, just last year, the Supreme Court applied the "longstanding interpretive presumption that 'person' does not include the sovereign," when it concluded that the U.S. Postal Service did not qualify as a person as that term was used in a particular provision of the Leahy-Smith America Invents Act of 2011. *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1861-62 (2019). The Court explained that "although the presumption is not a hard and fast rule of exclusion, it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Id.* at 1862.

That interpretative presumption controls here. The text of the CVRA does not define "person" and contains no "affirmative showing of statutory intent," *Vermont Agency*, 529 U.S. at 781, to include foreign governments within its reach. Moreover, the context of the CVRA further makes clear that its provisions were not meant to apply to agencies of foreign governments that wield considerable power in their own rights. The participatory and protective rights of the CVRA

(e.g., "[t]he right to be treated with fairness and with respect;" "[t]he right to be reasonably protected from the accused;" "[t]he right to reasonable, accurate, and timely notice of any public court proceeding . . . ") are more appropriately understood as protecting individuals, not agencies of foreign governments. *See* 18 U.S.C. §3771(a).

The understanding that the CVRA's definition of "person" does not include sovereign entities is supported by the United States Department of Justice, Attorney General Guidelines for Victim and Witness Assistance (2012) ("AG Guidelines"), which provide that "[n]either the federal government nor any state, local, tribal, or foreign government or agency thereof fall under the definition of crime victim for either mandatory services or court enforceable rights." *See* AG Guidelines at 12. Moreover, one district court has addressed this exact issue and concluded, based on the Dictionary Act and the AG Guidelines, that a sovereign entity cannot be a "crime victim" under the CVRA. *See United States v. Kasper*, 60 F. Supp. 3d 1177, 1178-79 (D.N.M. 2014) (holding that a tribal government was not a crime victim for purposes of the CVRA). In addition, a court in this district recently held that Empresa Publica de Hidrocarburos del Ecuador ("PetroEcuador"), a state-owned instrumentality, did not qualify as a victim under the CVRA. Although the court's order did not specify the precise rationale for its ruling, in response to the Eleventh Circuit's invitation to address PetroEcuador's petition for mandamus, the district court expanded on its basis for denying PetroEcuador's motion relating to the CVRA. Specifically, the district court "concluded that PetroEcuador, a state-owned instrumentality, is not a 'person' within the meaning of the CVRA, and by extension, not a crime victim." Response of District Judge, In re: Empresa Publica de Hidrocarbur, No. 20-11052-Q (11th Cir. Apr. 27, 2020) at 3-4. (Attached hereto as Exhibit A.)

In its motion, PDVSA relies on *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) and *GSS Group Ltd v. National Port Authority*, 680 F.3d 805, 817 (D.C. Cir. 2012) as support for the proposition that it should be viewed as merely a corporation and not as an agency of the Venezuelan government. DE 191:10. As such, PDVSA maintains, it is a foreign corporation that falls within the Dictionary Act's definition of "person," as opposed to an arm of the Venezuelan government. DE 191:10. However, PDVSA's status as an agency of a foreign government is uncontroverted. Indeed, PDVSA has represented itself to be a government entity in its filing in this case. DE 191:10. Moreover, in an unrelated civil action, the Delaware Chancery Court recognized PDVSA's status as a Venezuelan government agency and instrumentality. *See Jiménez v. Palacios*, C.A. No. 2019-0490-KSJM, 2019 WL 3526479, 9 (noting that Venezuela owns PDVSA and is the sole stockholder).[3]

In other contexts, courts have repeatedly classified foreign state-owned instrumentalities as agencies of a foreign government, not corporations. For example, the Foreign Sovereign Immunities Act ("FSIA") defines a "foreign state" as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The statute then defines an "agency or instrumentality of a foreign state" to be "any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United

---

[3] Setting aside PDVSA's argument that it should be viewed merely as a corporation and not as an agency of the Venezuelan government, PDVSA's reliance on *First National* and *GSS Group* to support restitution for state-owned entities is misplaced. For one, neither of these cases even mentions the CVRA, let alone determines that a foreign government, or instrumentality thereof, qualifies as a crime victim for purposes of that statute. Indeed, one of the two decisions predates the passage of both the CVRA and the MVRA and therefore had no occasion to consider the question presented here. More importantly, however, these cases concerned civil actions involving the Foreign Sovereign Immunities Act and the Federal Arbitration Act, not the offense of conviction in this prosecution, and neither involved a request for restitution from a state-owned entity complicit in a criminal scheme, as is the case here.

States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." 28 U.S.C. § 1603(b); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 471 (2003) (noting that certain provisions of FSIA may be invoked "by a corporate entity that is an 'instrumentality' of a foreign state"). Citing § 1603, the Eleventh Circuit has recognized that a "corporation wholly owned by the Government of France . . . is itself deemed a 'foreign state' for purposes of federal jurisdiction. *Vermeulen v. Renault*, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

Similarly, the Supreme Court concluded that Amtrak, a corporation, was not "an autonomous private enterprise" for purposes of the nondelegation doctrine but rather a "governmental entity" in light of the fact that "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 53 (2015). The Court reached this conclusion despite the fact that Congress had declared that "Amtrak 'is not a department, agency, or instrumentality of the United States Government'" and that "Amtrak 'shall be operated and managed as a for profit corporation.'" *See id*. at 50 (quoting 49 U.S.C. § 24301(a)(2) & (3)).

Thus, any assertion that PDVSA should be viewed merely as a corporation and not as an agency of the Venezuelan government is unconvincing in light of its own statements made in this litigation, the factual findings of another court concerning PDVSA's legal status, and analogous Supreme Court case law. That status as an agency of a foreign government precludes PDVSA from seeking victim status under the CVRA.[4] Because PDVSA does not qualify as a victim under

---

[4] The government recognizes that sovereign entities can be, and have been, recognized as victims entitled to restitution under the MVRA. *See, e.g., United States v. Zhang*, 789 F.3d 214, 216-17 (1st Cir. 2015) (holding that the IRS was an eligible victim under the MVRA and collecting cases). Although the definition of victim in the CVRA and MVRA is similar, these decisions rest primarily on statutory language in a separate enforcement provision of the MVRA, 18 U.S.C. § 3664, that specifically references the possibility that the United States can be designated as a victim entitled to restitution. *See Zhang*, 789 F.3d at 216 (citing 18 U.S.C. § 3664(i)). That provision prompted those courts to determine that the ordinary *Vermont Agency* presumption against including sovereigns within the definition of

the CVRA, it is not entitled to the rights guaranteed to crime victims pursuant to that statute and, to the extent its motion is brought under the CVRA, it should be denied.[5]

### B. PDVSA Is Not Entitled to the Rights of a Victim Under the MVRA or the CVRA Because PDVSA Was Complicit in the Illegal Conduct

When an individual or entity is complicit in criminal activity, as PDVSA is here, it is ineligible for restitution under the CVRA and MVRA based on that same activity. The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense . . . ." 18 U.S.C. § 3771(e)(2)(A). Similarly, the MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663A(a)(2). Although these statutory provisions defining a victim as someone "directly and proximately harmed" do not expressly exclude any category of persons, several courts, including the Eleventh Circuit, have concluded that significant policy reasons preclude those involved in criminal activity from being considered victims under the CVRA and MVRA. *See In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1238-40 (11th Cir. 2014) (per curiam) (holding that a corporation could not seek restitution for the criminal acts of its top-level executives because doing so would be seeking restitution "for its own conduct"); *see also United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006) ("[A]ny order entered under the MVRA that has the effect of treating coconspirators as 'victims,' and thereby requires 'restitutionary' payments to the perpetrators of the offense of conviction, contains an error

---

"person" had been overcome. Indeed, the AG Guidelines recognize that although foreign governments cannot be a victim under the CVRA, "they may qualify for restitution under federal restitution statutes." AG Guidelines at 12. These cases, however, do not have any bearing on the separate question of whether government entities, including a foreign government or instrumentality thereof, can be a crime victim under the CVRA.

[5] While the United States maintains that PDVSA, as an agency of the Venezuelan government, does not meet the statutory definition of a victim under the CVRA and therefore, there is no need to reach the discussion of whether the Defendant was the direct and proximate cause of its alleged harm, it is abundantly clear from the record, as discussed below, that the Defendant was not the direct and proximate cause of PDVSA's alleged harm.

so fundamental and so adversely reflecting on the public reputation of the judicial proceedings that we may, and do, deal with it *sua sponte*.").

The Eleventh Circuit's holding that a corporation that admitted "to engaging in illegal fraud cannot be a 'victim' of the fraud for purposes of the CVRA and MVRA" relied on a line of previous decisions from the Second and Ninth Circuits. *See In re Wellcare*, 754 F.3d at 1238-40. Specifically, in *United States v. Lazarenko*, 624 F.3d 1247, 1252 (9th Cir. 2010), the Ninth Circuit held that "as a general rule, a participant in a crime cannot recover restitution." There, the individual seeking restitution was described by the court as "both a victim and a participant" of a money laundering scheme who had "profited handsomely" from the conspiracy. *Id*. at 1250. The Ninth Circuit concluded that, based on these facts, he could not qualify as a "victim" under the MVRA, because such a reading of the statute would be "absurd." *Id*. at 1251. The court reasoned that co-conspirators should be treated differently than innocent victims because "[o]therwise, the federal courts would be involved in redistributing funds among wholly guilty co-conspirators, where one or more co-conspirators may have cheated their comrades." *Id*. at 1250-51. In reaching its conclusion, the Ninth Circuit relied on the Second Circuit's opinion in *Reifler*, in which that court vacated a restitution order *sua sponte* as "beyond the authority conferred by the MVRA" after concluding that the list of putative victims submitted to the court included some of the conspirators and nominees of the securities fraud scheme. *See Reifler*, 446 F.3d at 126-27, 132.

Courts in this district have denied three attempts by a state-owned entity to claim that it was defrauded by its employees and those individuals who paid bribes in Foreign Corrupt Practices Act ("FCPA") and money laundering prosecutions, holding each time that the state-owned entity did not qualify for victim status and restitution because of its complicity in the crimes.

13

In 2011, French corporation Alcatel-Lucent and two of its subsidiaries resolved an FCPA investigation with the government in which the parent company agreed to enter into a deferred prosecution agreement and the subsidiaries agreed to plead guilty to a criminal information charging them with conspiracy to violate the anti-bribery, books and records, and internal controls provisions of the FCPA in connection with bribes they had paid to officials of Instituto Costarricense de Electricidad ("ICE"), a state-owned Costa Rican telecommunications company. ICE filed a petition objecting to the proposed deferred prosecution agreement and plea agreement and seeking recognition as a victim pursuant to the CVRA on the same grounds as here; specifically, that ICE was a victim of the bribery scheme carried out by certain of its employees and by Alcatel-Lucent. The court denied ICE's request for victim status, finding, as a factual matter, that ICE was complicit in the criminal conduct in light of the "pervasive, constant, and consistent illegal conduct conducted by the 'principals' (i.e. members of the Board of Directors and management) of ICE," a determination which was upheld by the Eleventh Circuit. *See In re Instituto Costarricense de Electricidad*, No. 11-12707-G, at *2 (11th Cir. June 17, 2011).[6]

More recently, two courts in this district again rejected an attempt by a state-owned entity, PetroEcuador, to claim victim status under the CVRA and MVRA based on allegations that it was harmed by its employees and those individuals who paid the bribes in FCPA and money laundering prosecutions, holding that the state-owned entity did not qualify for victim status and restitution because of its complicity in the crimes. *See United States v. Juan Andres Baquerizo Escobar*, Case

---

[6] Neither the district court's oral ruling nor the Eleventh Circuit's order denying ICE's mandamus petition are published, but the Eleventh Circuit's order is appended to this response. *But see United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1304 (11th Cir. 2012) (per curiam) (summarizing the procedural history of the petition and mandamus decision in ICE's related direct appeal of the district court's decision and noting that the mandamus panel "concluded that the District Court 'did not clearly err in finding that [ICE] actually functioned as the offenders' coconspirator. The district court identified the pervasive, constant, and consistent illegal conduct'" by members of ICE's board and management).

No. 1:18-cr-20596-DPG (S.D. Fla. April 1, 2020 DE 113); *United States v. Jose Meluiades Cisneros Alarcon*, Case No. 1:19-cr-20284-RS (S.D. Fla. March 3, 2020 DE 103). In adopting the report and recommendations of the magistrate judge, the district court in *Baquerizo* agreed that PetroEcuador principals engaged in a level of pervasive, constant, and consistent illegal conduct that precluded their recognition under the MVRA and CVRA. *See Baquerizo*, Case No. 1:18-cr-20596-DPG (S.D. Fla. April 1, 2020 DE 113).

Much like in *In re Instituto Costarricense de Electricidad*, *In re Wellcare*, *Baquerizo*, and *Cisneros*, here, investigations and prosecutions in the United States and other countries throughout the world demonstrate the "pervasive, constant, and consistent illegal conduct conducted by the 'principals'" of PDVSA during the relevant period. Although the respective investigations are very much ongoing, as discussed above, PDVSA employees have been investigated and charged by countries around the world. Other PDVSA employees have been implicated in the bribery and money laundering schemes in the United States, including the Defendant, former Executive Director of Financial Planning for PDVSA,[7] and Cesar Rincon, former General Manger of PDVSA's procurement subsidiary, both of whom have admitted their participation in the schemes. Respectfully, this Court should reach the same decision here as in *In re Instituto Costarricense de Electricidad*, *In re Wellcare*, *Baquerizo*, and *Cisneros* and hold that PDVSA is not a victim in this case.

The fact that the government has not charged PDVSA with a crime in connection with the scheme or identified it as an unindicted coconspirator in the charging documents filed against the

---

[7] In addition to the Defendant's high-level management position within PDVSA at that time, Venezuelan Official 1, an unindicted co-conspirator who is alleged to have participated in the schemes and received bribes, is identified as a Vice President of PDVSA. DE 65, Ortega Factual Proffer ¶ 19. Also, Conspirator 1 is identified as a former PDVSA official. DE 3, Affidavit of Special Agent George Fernandez 12 n4. Again, the number and positions of the participants in the schemes throughout the company's ranks, the number of contractors in different lines of businesses who paid bribes, and the temporal span of the schemes all weigh towards PDVSA's complicity.

defendants in these cases is of no moment.  Numerous courts that have considered this issue have concluded that, although formal designation as a coconspirator would no doubt be sufficient to preclude a party from seeking victim status, it is by no means a necessary predicate.  *See, e.g.,* *United States v. Emor*, 850 F. Supp. 2d 176, 209 (D.D.C. 2012) ("[C]ourts have not limited the 'coconspirator exception' to the MVRA to situations in which the victim/participant was indicted by the grand jury.").  Moreover, even if a finding of corporate criminal liability on PDVSA's part was necessary to preclude it from seeking victim status under either the CVRA or the MVRA, the evidence gathered to date as part of the government's ongoing investigation demonstrates that the actions of senior PDVSA employees and executives can be imputed to PDVSA under the governing law to subject PDVSA to criminal liability.

PDVSA, however, argues that the Defendant is a rogue employee who embezzled or unlawfully diverted funds, relying on *United States v. Ramdeo*, 682 F. App'x 751 (11th Cir. 2017), *United States v. Futrell*, 209 F.3d 1286, 1290-91 (11th Cir. 2000), *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010), and *United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005), to support its conclusion that it is entitled to victim status and the payment of restitution.  While PDVSA acknowledges that corporations can be denied restitution where the corporation was a knowing participant, it argues that because "the end and the aim of the Eaton-Rantor conspiracy was to extract money from PDVSA," as opposed to defrauding others outside of PDVSA, it is a victim.  191:12.  In other words, it did not agree to or carry out a scheme to defraud itself.

These arguments are without merit.  First, unlike the defendants in *Ramdeo*, *Futrell*, *Lange*, and *Gee*, the Defendant did not act as a single rogue employee who defrauded PDVSA for his own personal benefit, rather, the Defendant was part of a group of PDVSA executives, including Venezuelan Official 1 and Conspirator 1, *see surpa* n.8, implicated for their complicity in the

bribery and money laundering schemes.  The Eleventh Circuit considered, and rejected, much the same argument in *In re Wellcare*.  In response to Wellcare's claim that it should not be considered a co-conspirator in the criminal activity because it was perpetrated by a small group of executives "without the involvement, knowledge or approval of the board of directors or the vast majority of Wellcare's employees," the Eleventh Circuit noted the long-standing principle that "a corporation only acts or wills by virtue of its employees."  *See In re Wellcare*, 754 F.3d at 1240 (citing *United States v. Dotterweich*, 320 U.S. 277, 281, (1943)).  Here, PDVSA's argument that the Defendant acted as rogue employee fails for the same reason.

Nor can PDVSA argue that it should escape liability for the actions of its employee because it allegedly suffered an injury from his conduct rather than a benefit.[8]  Numerous courts have held that there need not be proof of an actual benefit to the organization and, in fact, it can still be held criminally liable even if the actions of its employees harmed the company.  *See, e.g., Old Monastery Co. v. United States*, 147 F.2d 905, 908 (4th Cir. 1945) ("We do not accept benefit as a touchstone of corporate criminal liability; benefit, at best, is an evidential, not an operative, fact.").   In denying ICE's petition, the district court found that ICE "actually functioned as the offenders' coconspirator," yet neither the district court, nor the Eleventh Circuit in denying mandamus review, ever considered whether the "pervasive, constant, and consistent illegal conduct" by the management and Board of ICE was done with any intention to benefit ICE such that it could be held criminally liable under the principle of respondeat superior.  *See In re Instituto Costarricense de Electricidad*, No. 11-12707-G, at *2.  There is no reason that this Court should have to undertake such an unnecessary exercise here, particularly when it is not required by the numerous cases that have denied victim status and restitution to uncharged participants in a

---

[8]  As discussed below, the United States submits that PDVSA did not actually suffer an injury due to the Defendant's conduct.

criminal scheme as discussed above.  Criminal activity at PDVSA was taking place from the top tiers of management all the way down, and, as such, PDVSA was complicit and cannot be considered a victim.

### C. PDVSA Is Not Entitled to Restitution Under the MVRA for any Alleged Harms Resulting from Conduct that Was Not Charged or for Alleged Harms Not Directly and Proximately Caused by the Defendant's Criminal Conduct

Finally, PDVSA's motion should be rejected because its claim that it was "directly and proximately harmed" as a result of the Defendant's offense is premised on two faulty assumptions, one legal and the other factual.

First, a victim is entitled to restitution under the MVRA only if it can establish that it was directly and proximately harmed "by the defendant's *offense of conviction*."  *United States v. Dickerson*, 370 F.3d 1330, 1339 (11th Cir. 2004) (emphasis added).  Here, the offense for which the Defendant was convicted was conspiracy to launder money by knowingly engaging in a monetary transaction in property derived from a specified unlawful activity, specifically, a felony violation of the FCPA and a violation of Venezuelan law.  DE 53.  More specifically, the Defendant pleaded guilty in connection with his participation in the Joint-Venture scheme and the loan scheme with Companies C and D, and laundering those funds in the United States.  DE 65.  And, as the Eleventh Circuit has recognized, the victim of money laundering offenses is usually regarded as society as a whole.[9]  *See United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003) ("[T]he harm from such a transaction does not generally fall upon an individual, but falls upon society in general.").  It is certainly the case that restitution may be ordered for "acts of related conduct for

---

[9]  Indeed, the Presentence Investigation Report in this case notes that the citizens of Venezuela are the victims of Defendant Ortega's money laundering offense.  DE 74:24.  The text of the MVRA expressly provides that the statute does not apply where "the number of identifiable victims is so large as to make restitution impracticable."  18 U.S.C. § 3663A(c)(3)(A).  As Venezuela is a nation of almost 28 million people, this would render restitution impracticable.

which the defendant was not convicted," when the crime of conviction "includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense." *Dickerson*, 370 F.3d at 1339. However, PDVSA's claim that the harm associated with the loan contract it entered into on account of the bribe payments, *see infra*, at most could be thought of as a harm stemming from the predicate offenses of violations of the FCPA or Venezuela's bribery law that qualify as the specified unlawful activity for the money laundering charge. Those offenses, however, are not covered by the MVRA. The MVRA expressly limits the "offense[s] against property" to which it applies to offenses under Title 18 or the Controlled Substances Act. 18 U.S.C. § 3663A(c)(1)(A)(ii). The FCPA is an offense under Title 15 and, of course, provisions of Venezuelan law appear nowhere in the U.S. Code. PDVSA therefore cannot establish that it was "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

Second, even if PDVSA could base its claim of victim status on harm allegedly attributable to the specified unlawful activity underlying the money laundering charge to which the Defendant pleaded guilty, it cannot establish as a matter of fact that it was directly and proximately harmed by such conduct. *See United States v. Fiorentino*, 149 F. Supp. 3d 1352, 1357 (S.D. Fla. 2016) (a court can order a defendant "to pay restitution only for the loss of property that was the direct and proximate result of [the defendant's] unlawful conduct."). In the case of an offense involving a conspiracy, the MVRA only compensates specific victims who were (1) directly harmed (2) by the defendant's criminal conduct (3) in the course of the scheme, conspiracy, or pattern. 18 U.S.C. § 3663A(a)(2). The MVRA requires "not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v.*

*Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007).  "[A] criminal defendant cannot be compelled to pay for restitution for conduct committed outside the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction."  *Dickerson*, 370 F.3d at 1341.

Even if PDVSA were legally entitled to seek restitution, which, as explained above, it is not because of its complicity in the criminal conduct at issue, its motion for restitution also fails as a factual matter because the harm alleged by PDVSA is too factually attenuated from the Defendant's offense of conviction.  In its motion, PDVSA, claims that the Defendant "admitted his involvement in several fraudulent schemes that harmed PDSVA."  DE 191:2.  PDVSA acknowledges that the Defendant also accepted bribes to assist business partners of PDVSA in obtaining "priority status" in apparently legitimate transactions.  DE 191:4 n2.  Of note, PDVSA does not offer any evidence of the alleged pecuniary harm caused by the Defendant's conduct in accepting bribes with respect to these transactions.  Rather, PDVSA chooses to limit its argument for victim status and restitution to the Eaton-Rantor scheme "for simplicity."  DE 191:2, 4 n2.

PDVSA claims that the Defendant "admitted participating in the Eaton-Rantor conspiracy," and that one of the objects of that conspiracy was the delivery of PDVSA's funds to [the Defendant] as a bribe."  PDVSA also asserts that the Defendant took $12 million as a bribe payment, implying that it was for his role in the Eaton-Rantor scheme, relying in part, on law enforcement's tracing of funds from the Eaton-Rantor scheme to the Defendant.  DE 191:2.  PDVSA also mistakenly alleges that the Defendant's conduct included participation in the Eaton-Rantor scheme through the manipulation of "the levers of PDVSA from within to channel fake 'loan repayments' to shell companies in order to extract money from PDVSA."  DE 191:11.

PDVSA claims that, as a result of the Defendant's conduct in the Eaton-Rantor scheme, it suffered a pecuniary loss of approximately $560 million.  DE 191:4, 13-14.[10]

Contrary to PDVSA's assertions, the Defendant never admitted, nor is there evidence in the record indicating, that he participated in or was aware of the Eaton-Rantor scheme during the relevant time period.  As discussed above, the Defendant admitted to participating "in a bribery scheme (the 'Joint-Venture Scheme') in which [the Defendant] received a total of 5 million U.S. Dollars in exchange for acts and decisions in his official capacity to give both Company A and Company B 'priority" status' . . . ."  DE 65, Ortega Factual Proffer ¶ 9.  Specifically, the Defendant agreed to accept a $3 million bribe for recommending priority status for Company A and a $2 million bribe for recommending priority status for Company B to the PDVSA Board of Directors.  DE 65, Ortega Factual Proffer ¶¶ 11-12.  The Defendant's co-conspirators in the Joint-Venture scheme paid the bribe payments for the Joint-Venture Scheme to Defendant from their proceeds of the Eaton-Rantor scheme.  DE 65, Ortega Factual Proffer ¶ 24.  Thus, the record is clear that the source of the $5 million used to bribe the Defendant for his participation in the Joint-Venture scheme was incidentally derivative of the separate proceeds from the Eaton-Rantor scheme.

Where PDVSA misconstrues the relevant facts, however, is in its incorrect assumption that, simply because funds from the Eaton-Rantor scheme were traced to the Defendant, the Defendant necessarily participated in both the Eaton-Rantor scheme and the Joint-Venture scheme.  *See* 191:4 n2 (stating that "[the Defendant] also received bribes for the [Joint-Venture scheme]").   In fact,

---

[10]  Separate and apart from the factual weaknesses in PDVSA's argument, the United States submits that PDVSA's calculation of the alleged loss is not a reasonable approximation because it relies on current exchange rates as opposed to the actual alleged loss sustained at the time of the conduct.  DE 191:5, 14.  "[R]estitution seeks to make victims whole by reimbursing them for their losses[.]"  *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014).  Because "[r]estitution is not designed to punish the defendant[,] . . . the amount . . . owed . . . must be based on the amount of loss actually caused by the defendant's conduct."  *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015) (citation and internal quotation marks omitted).  *See also* 18 U.S.C. § 3663(a)(1)(B)(i)(I) (directing courts to consider the "amount of the loss sustained by each victim as a result of the offense").

while the Joint-Venture scheme and the Eaton-Rantor scheme shared co-conspirators in common, the Defendant was not one of them, having only agreed to accept bribes for his participation in the Joint-Venture scheme (and the loan scheme with Companies C and D) with the ultimate source of those Joint-Venture scheme bribes unknown to him at that time.[11]   The co-conspirators common to both schemes (*i.e.*, Conspirator 1, Conspirator 3, and co-defendant Francisco Convit) used the proceeds from their participation in the separate Eaton-Rantor scheme to bribe the Defendant for his participation in the separate Joint-Venture scheme.  So, while the Defendant may have received the proceeds of the Eaton-Rantor scheme (not knowing their particular source), his conduct could not be the direct and proximate cause of the alleged harm PDVSA attributes to the Eaton-Rantor scheme.  Thus, the causal connection between the Defendant's conduct and the alleged $560 million loss is too factually attenuated.  *See Robertson*, 493 F.3d at 1334.  The Defendant "cannot be compelled to pay for restitution for conduct committed outside the . . . conspiracy . . . underlying the offense of conviction."  *Dickerson*, 370 F.3d at 1341.  For this additional reason, PDVSA is not a victim entitled to mandatory restitution under the MVRA.

The MVRA also requires that an identifiable victim suffer a pecuniary loss.  18 U.S.C. § 3663A(c)(1)(B).  PDVSA alleges that this loss was approximately $560 million.  DE 191:4-5, 13-14.  Even assuming arguendo that the Defendant directly and proximately caused the harm, which the United States maintains he did not, the record is clear that PDVSA did not actually suffer

---

[11]  As discussed above, PDVSA limited the scope of its motion for victim status and restitution to the Eaton-Rantor scheme and offered no evidence or argument with respect to any purported loss in connection with either the Joint-Venture scheme or the loan scheme with Companies C and D (*i.e.*, the schemes for which the Defendant actually admitted his participation).  Moreover, although PDVSA acknowledges that the Defendant accepted bribes for the Joint-Venture scheme, it concedes that it was for apparently legitimate business transactions, implying that there was no loss to PDVSA, since the Defendant's conduct of recommending priority status for PDVSA business partners did not result in a pecuniary loss to PDVSA.  PDVSA does not address the loan scheme to Companies C and D in its motion, presumably because there is no pecuniary loss to PDVSA with respect to that scheme as well.  As PDVSA bears the burden of proof that it is entitled to victim status and restitution under the MVRA, it has failed to carry that burden with respect to either of the schemes to which the Defendant pleaded guilty—the joint-venture scheme or the loan scheme involving Companies C and D.

a pecuniary loss.  First, "[a]t all relevant times Venezuela had a foreign-currency exchange system under which the government would exchange local currency (Bolivars) at a fixed rate for U.S. Dollars."  DE 65:1.  Further, "PDVSA [was] Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros)."  DE 65:2.  As PDVSA concedes, the Eaton-Rantor scheme required PDVSA to pay the loan back at the same fixed-rate for U.S. dollars as used by the Venezuelan government.  DE 191:13.  PDVSA also concedes that PDVSA received the agreed upon 7.2 billion Bolivars under the Eaton-Rantor scheme based on the fixed rate for U.S. dollars. DE 191:15.  Based on these facts, PDVSA paid the same amount of U.S. dollars for the same number of Bolivars as they otherwise would have had to pay if they were exchanging those U.S. dollars with the Venezuelan government.  Therefore, PDVSA did not suffer a pecuniary loss.  As such, PDVSA is not entitled to restitution under the MVRA for the alleged harm caused by the Eaton-Rantor scheme.

As PDVSA has failed to establish that it was directly and proximately harmed by the defendant's offense of conviction (*i.e.*, conspiracy to commit money laundering), that it suffered any pecuniary loss, or that there is a causal connection between the Defendant's conduct and the loss alleged, its claim for relief under the MVRA should be denied.

## <u>CONCLUSION</u>

This Court should deny PDVSA's Motion for Victim Status and Restitution because: (1) PDVSA, as a state-owned instrumentality, does not qualify as a victim under the CVRA; (2) PDVSA's complicity in the bribery and money laundering schemes precludes it from being treated as a victim under both the MVRA and the CVRA; and (3) PDVSA is not entitled to restitution under the MVRA for any alleged harm resulting from conduct that was not charged or for alleged harms not directly and proximately caused by the Defendant's criminal conduct.  Because, the

government submits that there is no need for further briefing or any evidentiary showing, PDVSA's alternative request for a restitution hearing also should be denied.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:     s/ Michael B. Nadler
        Michael B. Nadler
        Assistant U. S. Attorney
        Court I.D. No. 51264
        99 Northeast 4th Street
        Miami, Florida 33132-2111
        Tel. (305) 961-9244
        michael.nadler@usdoj.gov

        ROBERT ZINK
        CHIEF, FRAUD SECTION

By:     s/ Paul A. Hayden
        Paul A. Hayden
        Trial Attorney
        Department of Justice
        1400 New York Ave. N.W.
        Washington, D.C. 20530
        Tel. (202) 353-9370
        paul.hayden2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by

CM/ECF.

<u>s/ Paul A. Hayden</u>
PAUL A. HAYDEN
TRIAL ATTORNEY

## <u>APPENDIX OF UNREPORTED CASES</u>

<u>Index of Cases</u>

*In re Instituto Costarricense de Electricidad*, No. 11-12707-G (11th Cir. June 17, 2011)……….2

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

JUN 1 7 2011

JOHN LEY
CLERK

No. 11-12707-G

In re:  INSTITUTO COSTARRICENSE DE ELECTRICIDAD,

Petitioner.

No. 11-12708-G

In re:  INSTITUTO COSTARRICENSE DE ELECTRICIDAD,

Petitioner.

--------------------------

On Petition for Writ of Mandamus to the United States
District Court for the Southern District of Florida

--------------------------

Before: WILSON and MARTIN, Circuit Judges

BY THE COURT:

As an initial matter, the Court, <u>sua sponte</u>, consolidates the petitions for writ

of mandamus docketed in case numbers 11-12707 and 11-12708.

Petitioner seeks a writ of mandamus pursuant to the Crime Victims' Rights

Act, 18 U.S.C. § 3771(d)(3).  In reviewing a petition for a writ of mandamus under

2

§ 3771(d)(3) we must determine "whether the district . . . base[d] its decision on findings of fact that are clearly erroneous . . . [and] if not, [whether] it misappl[ied] the law to such findings." In re Stewart, ---F.3d---, 2011 WL 2023457, at *3 (11th Cir. 2011). "To prevail [under the CVRA], a victim must demonstrate some injury . . . caused by the offender's crime." Id. The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771(e); see also In re Stewart, 552 F.3d 1285, 1288 (11th Cir. 2008) (explaining that if "criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA").

The district court did not clearly err in finding that "Instituto Costarricense de Electricidad" ("ICE"), here seeking to be deemed a "crime victim," actually functioned as the offenders' coconspirator. The district court identified the pervasive, constant, and consistent illegal conduct conducted by the "principals" (i.e. members of the Board of Directors and management) of ICE, the organization claiming status as a victim under the CVRA. Neither did the district court err in finding that ICE failed to establish that it was directly and proximately harmed by the offenders' criminal conduct. Cf. United States v. Lazarenko, 624 F.3d 1247, 1252 (9th Cir. 2010) ("[A]s a general rule, a participant in a crime cannot recover restitution.").

Petitioner's Petitions for Writ of Mandamus are DENIED.  The Motion to

Extend the 72 hour deadline established by 18 U.S.C. § 3771(d)(3) is also

DENIED.