IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

UNITED STATES OF AMERICA

v.

ABRAHAM EDGARDO ORTEGA,

*Defendant*.

Case No.: 1:18-cr-20685-KMW

# REPLY IN SUPPORT OF MOTION
# FOR VICTIM STATUS AND RESTITUTION

ARNOLD & PORTER
   KAYE SCHOLER LLP

250 West 55th Street
New York, NY 10019
Telephone: +1 212.836.8344

*Attorneys for Petróleos de Venezuela, S.A.*

June 18, 2020

Petróleos de Venezuela, S.A. (PDVSA) seeks restitution of money stolen by a corrupt employee. *See* DE 191 ("Mot."). It does so under the management of a new administrative board appointed by Interim President Juan Guaidó and the Venezuelan National Assembly for the specific purpose of preserving and protecting PDVSA's assets abroad, following a determination by its Special Attorney General that doing so is necessary to protect the interests of the people of Venezuela. President Guaidó and the National Assembly are recognized by the United States as the Republic's only legitimate government; their efforts to insulate PDVSA from the Maduro regime, and to recover looted assets, are an important element of the broader objectives of ending Maduro's corruption and human rights abuses, alleviating the Republic's humanitarian crisis, and ultimately restoring economic prosperity and the rule of law—objectives shared by the United States. Indeed, two successive U.S. Presidents have determined that the situation in Venezuela—including the "exacerbating presence of significant public corruption"—constitutes "an unusual and extraordinary threat to the national security and foreign policy of the United States," Exec. Order 13,692, 80 Fed. Reg. 12,747 (Mar. 8, 2015); Exec. Order 13,884, 84 Fed. Reg. 38,843 (Aug. 5, 2019), and Congress has instructed the Executive Branch to help secure the return of "assets taken from the people and institutions of Venezuela through theft, corruption, [and] money laundering" to "a future democratic government in Venezuela." VERDAD Act, Pub. L. No. 116-94, div. J, Tit. I, § 151(a)(2), (b)(2) (codified at 22 U.S.C. § 9741).

Failing to recognize the status of the Special Attorney General and the new PDVSA Board—treating them as if they represented the crime's perpetrators, rather than its victim—would be an affront to the Republic, a United States ally. This Court should not do so without input from the State Department. *See Republic of Austria v. Altmann*, 541 U.S. 677, 702 & n.23 (2004).

On the merits, the United States offers no sound reason to foreclose PDVSA's recovery.

1

Its primary argument—that sovereigns are not covered by the CVRA—is entirely irrelevant to whether PDVSA can recover restitution, as the United States admits that sovereign entities can be MVRA "victims." And its other arguments for why PDVSA is not entitled to restitution under the MVRA are irreconcilable with binding precedent, with the admissions Ortega has made, and with the sworn factual assertions of its own agents. The Court should order restitution.

## ARGUMENT

### I. Corruption By Former PDVSA Officials Does Not Preclude PDVSA Under Supervision of the Special Attorney General From Recovering Looted Assets

Corporations can recover restitution from rogue employees and officers who, like Ortega, have stolen their funds, as the United States agrees. Opp. 16; *see, e.g.*, *United States v. Ramdeo*, 682 F. App'x 751, 758 (11th Cir. 2017). But the United States argues that PDVSA may not obtain restitution here under a "perpetrator bar" or "co-conspirator exception," because "an individual or entity [that] is complicit in criminal activity is ineligible for restitution under the CVRA or MVRA based on that same activity." Opp. 12. The perpetrator bar does not apply here, for two reasons.

First, PDVSA is now under the control of an ad hoc Administrative Board (the "Board"), appointed to prevent further looting, and of the Special Attorney General, who is obliged to recover stolen assets. The involvement of the Board and the Special Attorney General cleanses PDVSA of any imputed prior criminal wrongdoing by rogue employees, as would be the case with a receiver. This is a matter of the utmost importance to the Republic, as it implicates potentially numerous cases involving many millions of dollars rightfully belonging to the people of Venezuela.

Second, on the facts of this case, PDVSA was not a perpetrator in the Eaton-Rantor scheme.

### A. The Appointment of PDVSA's Ad Hoc Board and Removal of Maduro Control Renders Restitution Appropriate

As the United States explains, "[a]t *all* times during the relevant time period [of criminal activity], PDVSA's operations were controlled by the Ministry of Petroleum and the Board of

2

Directors, as appointed by former Venezuelan President [Chávez] and former President Maduro." Opp. 3 (emphasis added). Following these events, the U.S.-recognized representatives of the Republic removed PDVSA's U.S. assets from Maduro's control pursuant to the Democracy Transition Statute and Presidential Decree No. 3; they also established the Board to protect those assets. *See Jiménez v. Palacios*, 2019 WL 3526479, at *3 (Del. Ch. Aug. 2, 2019) (recognizing control of Guaidó-appointed PDVSA board). The Democracy Transition Statute, moreover, guarantees "functional autonomy" to PDVSA's subsidiaries, which "shall have no relationship whatsoever with the people currently usurping the Presidency of the Republic." DE 191-2 at 25-26. Thus, neither PDVSA's ad hoc Board, nor PDVSA's subsidiaries, follow instructions from the Maduro regime. And because it had become "obvious that new measures had to be implemented to protect Venezuelan State assets abroad," President Guaidó gave the Board power, "in coordination with the Special Attorney General," to "legally represent PDVSA and its subsidiaries abroad." DE 191-3 at 17-18. The Special Attorney General "investigate[d] the pending application" in this Court, and determined that PDVSA should apply for restitution "in order to protect the assets of the Venezuelan people." DE 192 at 4. Indeed, PDVSA's right to claim restitution is rooted in one of the main principles of the Democracy Transition Statute: to "investigat[e] … any illicit activity related to corruption and money laundering in order to ensure the recovery of capital derived from such illicit activities." Second Yalowitz Decl. Ex. A, at 23.

The United States correctly observes (Opp. 12-13) that granting restitution to a coconspirator of the very crime at issue risks sullying "the public reputation of the judicial proceedings." But that public-policy rationale does not apply here, where PDVSA's U.S. assets are controlled by a new ad hoc Administrative Board and the Special Attorney General is supervising the proceedings as necessary to protect these assets for the Venezuelan people. The Special Attorney General's

3

determination comports with official U.S. foreign policy. On January 28, 2019, the Treasury Department imposed sanctions freezing PDVSA's assets. *See* Determination Pursuant to Section 1(a)(i) of Executive Order 13,850 (Jan. 28, 2019).[1] The Treasury Secretary explained: "Today's designation of PDVSA will help prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela."[2] Treasury then issued an advisory warning against continued Venezuelan attempts to launder money stolen from PSVSA, stating that the "people are being preyed upon" and that "[t]his money rightfully belongs to the people of Venezuela."[3] Congress has also called for the return to "a future democratic government in Venezuela" of "assets taken from the people and institutions of Venezuela through theft, corruption, [and] money laundering."[4]

Receivership cases are instructive. Misconduct by officers and employees is typically imputed to the corporations on whose behalf such persons commit fraud, but such imputation ends once the corporation has been "'cleansed' through receivership." *Sallah ex rel. MRT LLC v. Worldwide Clearing LLC*, 860 F. Supp. 2d 1329, 1334 (S.D. Fla. 2011).[5] Here, PDVSA's new Board

---

[1] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/vz_sector_determination_oil_20190128.pdf.

[2] Press Release, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594.

[3] News Release, *Updated FinCEN Advisory Warns Against Continued Corrupt Venezuelan Attempts to Steal, Hide, or Launder Money* (May 3, 2019), https://www.fincen.gov/news/news-releases/updated-fincen-advisory-warns-against-continued-corrupt-venezuelan-attempts.

[4] VERDAD Act of 2019, Pub. L. No. 116-94, div. J., tit. I, § 151(a)(2), (b)(2) (Dec. 20, 2019) (codified at 22 U.S.C. § 9741).

[5] *See, e.g.*, *Iglesia Cristiana El Buen Samaritano, Inc. v. Guardian Servs., LLC*, 2011 WL 5854640, at *6 (S.D. Fla. Nov. 21, 2011); *Pearlman v. Alexis*, 2009 WL 3161830, at *4 (S.D. Fla. Sept. 25, 2009) ("the appointment of a receiver displaces the managers who had engaged in the wrongful conduct, and thus ensures that any recovery would go to the receiver and ultimately the innocent creditors, rather than the wrongdoers"); *In re E.S. Bankest, L.C.*, 2010 WL 2926203, at *3 (Bankr. S.D. Fla. July 23, 2010) ("There is substantial law that imputation and *in pari delicto* do not apply to a Court-appointed Receiver.").

and the supervision of the Special Attorney General are the functional equivalent of a receivership appointed by an administrative agency. Thus, the "equity and policy objectives" relevant to "determining that the pre-receivership conduct of wrongdoers … should not be imputed" to the Special Attorney General. *Colonial BancGroup Inc. v. PricewaterhouseCoopers LLP*, 2017 WL 4175029, at *3 (M.D. Ala. Aug. 18, 2017); *see, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995). Accordingly, even if Ortega's wronging in the Eaton-Rantor scheme would otherwise be imputable to PDVSA—and as discussed below, it is not—such imputation should not preclude recovery by PDVSA under its current supervision.

### B. The Perpetrator Bar Does Not Apply To the Eaton-Rantor Scheme

The MVRA contemplates that "perpetrators and victims" form "two distinct classes," such that "a perpetrator cannot be his own victim. Consequently, an entity that admits to engaging in illegal fraud cannot be a 'victim' of that fraud." *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1239 (11th Cir. 2014). Courts have thus declined to award restitution that would "ha[ve] the effect of treating coconspirators as 'victims,' … thereby requir[ing] 'restitutionary' payments to the perpetrators of the offense of conviction." *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006).

"The relevant inquiry is whether the ostensible victim was a knowing participant in the very offense for which the defendant was ordered to pay restitution, sharing the goals of the defendant." *United States v. Emor*, 850 F. Supp. 2d 176, 210 (D.D.C. 2012). "[R]estitution under the MVRA may not be denied simply because the victim had greedy or dishonest motives, where those intentions were not *in pari materia* with those of the defendant." *United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008). *Ojeikere* upheld restitution for victims who attempted to conspire with the defendant to engage in a scam to remove money from Nigeria, but "were *not* involved in the *offense of conviction*, which was a fraudulent scheme to obtain money from them. Whatever illegal scheme the victims thought they were involved in, it was not a scheme to lose their *own*

5

money, which they earned fairly (as far as we know), lost, and now want returned." *Id*. at 222-23.

Here, the offense of conviction was a scheme to steal and launder money *from PDVSA*, according to the United States' own agents. That brings PDVSA outside the perpetrator bar. The United States concedes that the bar applies only when an "entity is complicit in criminal activity" and seeks restitution "*based on that same activity*." Opp. 12 (emphasis added). All its cited cases share that key feature, which is not present here: The restitution applicant actively participated in, and either benefited or attempted to benefit from, the very scheme of which the defendant was convicted—the "offense of conviction." The putative "victim" was denied restitution because the applicant was complicit in a scheme to steal from a third party.

Thus in *Wellcare*, the Eleventh Circuit denied restitution because the applicant admitted participating in the underlying fraud—stealing money from the State of Florida—and then sought restitution for its own misconduct. 754 F.3d at 1240. In *Reifler*, 446 F.3d at 70, 125-26, restitution was denied to charged co-conspirators who had actively taken part in a securities-fraud scheme, but had been included in the order of restitution because they were on a list of investors who suffered losses. In *United States v. Lazarenko*, 624 F.3d 1247, 1250 (9th Cir. 2010), the applicant was "a co-conspirator in the crimes of conviction." And in *Emor*, 850 F. Supp. 2d at 204, the applicant corporation "was the defendant's alter ego during the time of his fraud scheme."

The United States never asserts that PDVSA was a co-conspirator in the Eaton-Rantor scheme. Instead, it argues (Opp. 14-15) for applying a different standard—that "pervasive, constant, and consistent illegal conduct," standing alone, automatically precludes "victim" status. But that is wrong—"even a thief can be the victim of a crime." *United States v. Boscarino*, 437 F.3d 634, 637 (7th Cir. 2006). For example, the victims in *Ojeikere* were far from innocent; they thought they were assisting in an illegal scheme to obtain money from Nigeria. Nevertheless, the Second

6

Circuit explained, "a would-be burglar who is robbed by a potential accomplice before either of them commits the planned crime may be entitled to restitution." 545 F.3d at 223.

For its alternative standard, the United States relies on three cases, none of which support its argument. In two of them, the court found that the applicant "actually functioned as the offenders' coconspirator." *In re Instituto Costarricense de Electridad*, No. 11-12707 at 3 (11th Cir. June 17, 2011); *see United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1304 (11th Cir. 2012) (same). The phrase "pervasive, constant, and consistent illegal conduct" appears in the unpublished orders, but not as a legal test: The words provided factual context for the district court's key determination that the restitution applicant's "'*participation as a coconspirator* precludes it from attaining victim status.'" Order at 1, *United States v. Cisneros*, No. 18-cr-20658 (S.D. Fla. Mar. 3, 2020) (DE 103) (emphasis added) (quoting *Wellcare*). *Cisneros* found that PetroEcuador was "complicit *in the underlying criminal activity*, [and] that [its] participation as a coconspirator preclude[d] it from attaining victim status." (DE 193-1 at 6 (emphasis added).) The conspiracy directed legitimate contracts to the bribe-paying entities—no one stole money from PetroEcuador, which in fact suffered no loss. *Id.* at 8. Here, by contrast, the United States has represented to the Court that the Eaton-Rantor scheme involved sham contracts, created "to embezzle approximately 600 million U.S. Dollars *from PDVSA*." (DE 3 ¶ 30 (emphasis added).) The two unpublished decisions in the United States' notice of supplemental authority (DE 202) similarly undermine its position. In both, the defendant's actions were "imputed to" the restitution applicant, since "obtaining and retaining contracts on behalf of [the applicant] was within the scope of their employment and they acted, at least in part, to benefit [the applicant]." (DE 202-1 at 3; DE 202-2 at 2-3).

Here, in contrast, the Eaton-Rantor scheme cannot be imputed to PDVSA, since the whole point of the conspiracy was to steal money *from PDVSA*. The United States cites no case denying

7

restitution to a putative victim who supposedly stole from itself, nor any case holding that illegal conduct among corporate executives—no matter how "pervasive, constant, and consistent"—is *alone* sufficient to preclude restitution. To the contrary, when a complicit party becomes "the object of, rather than a participant in the [defendant's] criminal goals," courts uniformly *permit* recovery. *United States v. Sanga*, 967 F.2d 1332, 1335 (9th Cir. 1992); *see id.* at 1333 (victim recovered restitution despite being "a willing participant in the conspiracy to smuggle herself into Guam"); *Ojeikere*, 545 F.3d at 223 ("Whatever illegal scheme the victims thought they were involved in, it was not a scheme to lose their *own* money…."); *Boscarino*, 437 F.3d at 637 ("even a thief can be the victim"). The point is not that a conspirator must "benefit" from a conspiracy to be *liable*, Opp. 17; it is that courts do not apply the perpetrator bar to the targets of the underling criminal scheme, even if they committed unrelated wrongdoing.

The perpetrator bar thus has no application here. PDVSA has not been charged or even named as a conspirator; and the United States does not claim that PDVSA, as an entity, had criminal intent "in *pari materia* with those of the defendant." *Ojeikere*, 545 F.3d at 223. The Eleventh Circuit has rejected an argument like the one here, holding that when an employee "loot[s]" a corporate employer, it acts "adversely to [the company's] interests," and "imputation of [that employee's] wrongdoing to the [company] would be inappropriate." *Liquidation Comm'n of Banco Intercont'l, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008). "It would be perverse indeed if the Commission was unable to pursue a claim on behalf of [the] other stakeholders solely because some of the people who stole from it were insiders in a position to carry out the fraud!" *Id.*

To be sure, two additional PDVSA employees have been identified as unindicted co-conspirators in the Eaton-Rantor scheme, and a total of eleven "bribe-receiving PDVSA officials" have been charged in "ongoing bribery and money laundering investigations involving PDVSA."

Opp. 3-4, 15 n.7. But, as explained above, having eleven corrupt employees does not make PDVSA a co-conspirator in all crimes committed by any employee—and certainly not complicit in a crime that the United States itself describes as a "scheme to embezzle approximately 600 million U.S. Dollars *from PDVSA*." (DE 3 ¶ 30 (emphasis added).)

The United States' theory boils down to the idea that, if one employee steals money from a company, the company can recover restitution; but if a larger number of employees pile on (here, three—or eleven), then restitution is forbidden. The MVRA provides no basis for that unjust result.

## II.     A Corporation Owned by a Foreign Sovereign May Obtain Restitution

The United States concedes (Opp. 11 n.4) that "sovereign entities can be, and have been, entitled to restitution under the MVRA." That concession is correct. The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2), and statutes referring to a "person" are normally understood to "include corporations." 1 U.S.C. § 1.

Confusingly, the United States relegates that concession to a footnote, after arguing at length that a corporation owned by a foreign sovereign cannot be a "crime victim" *under the CVRA*. But the concession is dispositive on the *restitution* question: The United States admits that PDVSA can be a "victim," for whom restitution is mandatory *under the MVRA*. The United States' argument about the CVRA is thus completely irrelevant to the payment of restitution or its amount.

The CVRA argument is incorrect anyway. The United States says (Opp. 9) that PDVSA is not a "person" within the CVRA because the term "does not include sovereign entities," such as "agencies of foreign governments." But PDVSA is *not* an agency of a foreign government; it is a corporation, which as a "duly created instrumentalit[y] of a foreign state" must "be accorded a presumption of independent status" under U.S. law. *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 627 (1983); *see Hercaire Int'l, Inc. v. Argentina*,

9

821 F.2d 559, 564 (11th Cir. 1987) (noting the "distinction[s] between an instrumentality and an agency"). The United States says (Opp. 10 n.3) that *Bancec* is irrelevant because it doesn't "mention[] the CVRA." But *Bancec*, which predated the CVRA, interpreted a federal statute against the backdrop of common law principles under which a corporation and its shareholders are "accorded separate legal status." 462 U.S. at 628.[6] The cases relied on by the United States (Opp. 9) accordingly respect the distinction between a corporation and its governmental shareholder.[7] Nothing about the CVRA suggests that Congress intended to deviate from those principles.[8]

Even if PDVSA were a sovereign or agency (it is not), the CVRA would still apply: (1) *Vermont Agency* excludes sovereigns from the definition of "person" only when applied to "the enacting sovereign" (which Venezuela is not) or to a "statutory provision authorizing private suit" (which the CVRA is not), *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 n.9 (2000); (2) the CVRA's definition of "victim" is functionally identical to the MVRA's definition, *see* 18 U.S.C. § 3771(e)(2)(A); (3) the CVRA's sponsors stated that its "definition of a

---

[6] Having disparaged the relevance of *Bancec* because it interpreted the Foreign Sovereign Immunities Act, the United States then relies on the FSIA's "defin[ition of] a 'foreign state' as including 'a political subdivision of a foreign state or an agency or instrumentality of a foreign state.'" Opp. 10 (quoting 28 U.S.C. § 1603(a)). That proves the opposite of what the United States seems to think: If state-owned instrumentalities were the same as agencies, there would be no need for the statute to list them separately; the two are distinct *unless* Congress says otherwise.

[7] In *United States v. Kasper*, 60 F. Supp. 3d 1177 (D.N.M. 2014), an Indian tribe requested restitution for the criminal conduct of an employee who worked for a corporation of which the tribe was the sole shareholder. Though recognizing that *the corporation* could be a CVRA "victim," the court denied restitution to *the tribe* because the two "are not the same legal entity." *Id.* at 1179. Restitution was denied to government-owned corporations in *Cisneros*, *Electricidad*, and *Baquerizo* (*see* Opp. 14-15), but only because the corporations actively participated in the crimes—not because the court thought government-owned corporations were ineligible. Indeed, the entire analysis would have been unnecessary if the corporations were categorically ineligible.

[8] The United States' notice of supplemental authority attaches (*see* DE 202-1) an unpublished decision stating, without explanation, that "a corporation owned entirely by Ecuador" *is* a "sovereign." *In re Empresa Pública de Hidrocarburos*, No. 20-11052, at 2 (11th Cir. May 26, 2020). Even if that offhand assertion did not contradict binding authority, it should not change the result: Sovereign-owned corporations are still corporations, and thus "persons" under the Dictionary Act.

10

crime victim is based on the federal restitution statutes," *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 460 (D.N.J. 2009) (quoting Sen. Kyl); (4) Congress enacted the CVRA after courts had already interpreted the MVRA to cover sovereign entities, *see United States v. Senty-Haugen*, 449 F.3d 862, 865 (8th Cir. 2006); and (5) cases interpreting the MVRA are authoritative "for how the CVRA is to be interpreted procedurally and for when an individual qualifies as a victim of a conspiracy," *In re McNulty*, 597 F.3d 344, 350 n.6 (6th Cir. 2010).[9]

## III. PDVSA Suffered Pecuniary Loss Caused by Defendant's Criminal Scheme

The United States asserts (Opp. 20) that the Eaton-Rantor scheme is "too factually attenuated" from Ortega's offense of conviction to support restitution. But that assertion cannot be squared with Ortega's plea agreement, his factual proffer, and affidavits from government officials describing his criminal conduct—all showing that his money laundering conspiracy was part of the Eaton-Rantor scheme, which produced the very "proceeds" that Ortega laundered.

Indeed, the factual proffer devotes an entire section to the Eaton-Rantor scheme, stating that "Ortega and others conspired to launder and engage in monetary transactions *with the proceeds of corrupt currency exchange schemes involving PDVSA*." (DE 65 ¶ 5 (emphasis added).) Eaton, one of the companies in the sham loan transaction, was "controlled by members of the conspiracy." *Id.* ¶ 18. And Agent Vega's declaration supporting this Court's forfeiture order explains that a confidential source was "tasked with laundering … illicit proceeds from the Eaton-Rantor Loan Scheme for the benefit of Defendant Abraham Edgardo Ortega." DE 120-1 ¶ 8.

The United States offhandedly suggests (Opp. 20) that Ortega, who received millions in

---

[9] Excluding foreign sovereigns and their instrumentalities from the CVRA would also create an illogical system in which such entities would be eligible for mandatory payment of restitution, yet would be excluded from participation in the proceedings that determine the *amount* of restitution they are owed. The United States says (Opp. 8-9) that the CVRA's "participatory and protective rights … are more appropriately understood as protecting individuals." But it concedes that the CVRA applies to corporate victims and other juridical entities—not just individuals.

kickbacks derived from the Eaton-Rantor scheme, somehow was not "aware" of it, but the affidavit of the primary investigating agent tells an entirely different story. *See* Mot. 3-4 (DE 191). In 2016, for example, Ortega was recorded discussing with his co-conspirators where they planned "to account for and distribute the PDVSA funds to themselves and others," and in doing so "explicitly acknowledged the money laundering conspiracy and underlying embezzlement." (DE 3 ¶ 54.) Ortega also expressly "acknowledged [another conspirator's] role in assigning him a portion of the PDVSA funds" and "fretted" about his ability to avoid detection. *Id.* ¶ 56. The "PDVSA funds" being discussed were those generated through the Eaton-Rantor scheme. *Id.* ¶¶ 30, 46.

The United States never disputes that Ortega's crimes were part of the Eaton-Rantor conspiracy. Even if "the various spokes" of the conspiracy did not all actively participate in all the unlawful conduct, such conspirators were "aware of each other and of their common aim," and thus members of "a single conspiracy." *United States v. Huff*, 609 F.3d 1240, 1244 (11th Cir. 2010) (quotation marks omitted). At the very least, the conspiracy's scope is a question of fact that this Court must "resolve[] … by the preponderance of the evidence," 18 U.S.C. § 3664(e).[10]

The United States is correct (Opp. 18 & n.9) that Ortega's conspiracy harmed many victims *in addition to* PDVSA—including millions of Venezuelans. But the fact that Ortega and his co-conspirators caused widespread harm does not preclude PDVSA from recovering for its direct losses. *Boscarino*, 437 F.3d at 637 ("Instead of determining the ultimate incidence of costs created by criminal activity, judges should direct restitution to the immediate victim; other persons' rights in the funds then may be sorted out under normal rules of contract and property law.").

Finally, PDVSA was injured by the Eaton-Rantor scheme. U.S. agents have consistently

---

[10] Ortega's presentence investigation report, to which PDVSA does not have access, may contain further support for Ortega's awareness of the Eaton-Rantor scheme.

12

characterized the crime as a "scheme to embezzle approximately 600 million U.S. Dollars from PDVSA." (DE 3 ¶ 30; *see id.* ¶ 45 ("an artless attempt to hide what was ultimately revealed as an embezzlement").) The sham loan transaction used PDVSA's money to create some $500 million in proceeds for the conspiracy. (DE 65 ¶¶ 15-19.) The United States is free to argue that the amount of PDVSA's true economic loss is lower than $560 million, but surely the loss is not *nothing*. Neither the United States nor Ortega disputes that joint and several liability is proper as to each coconspirator, nor does either suggest that an offset would be appropriate. Thus, the Court should order restitution against Ortega in the full amount of $560,033,118.19. Mot. 14-16.[11]

### IV.     If This Court Finds Any Facts in Dispute, It Should Hold an Evidentiary Hearing

The United States does not deny that this Court can hold an evidentiary hearing to resolve any factual disputes related to PDVSA's claim for restitution. While the United States suggests (Opp. 2 n.2) that a hearing would be fruitless (or would unduly complicate sentencing) because PDVSA's current representatives do not have access to records of the company's transactions, the United States appears to have collected a great deal of evidence that it has elected not to share with PDVSA. Sharing it surely would aid in resolving factual issues, including the amount of restitution owed and the extent of Ortega's involvement in the Eaton-Rantor scheme, *see supra* pp. 11-12.

### CONCLUSION

The Court should grant PDVSA's motion for victim status and restitution.

---

[11] Current exchange rates appropriately reflect PDVSA's economic losses, but the U.S. dollar/Euro exchange rate from the time of the Eaton-Rantor scheme (*see* Opp. 21 n.10) was actually higher (*i.e.* the stolen Euros were more valuable), at 1.219 U.S. dollars per Euro. *See* Dep't of Treasury, *Treasury Reporting Rates of Exchange as of December 31, 2014*, https://www.fiscal.treasury.gov/files/reports-statements/treasury-reporting-rates-exchange/itin-12-31-2014.pdf.

Dated: June 18, 2020	Respectfully submitted,

	ARNOLD & PORTER
		KAYE SCHOLER LLP

	_____
	Jason A. Ross (Florida Bar No. 59466)
	601 Massachusetts Ave., N.W.
	Washington, DC 20001-3743
	Telephone: +1 202.942.5000
	Fax: +1 202.942.5999
	jason.ross@arnoldporter.com

		– and –

	Kent A. Yalowitz (admitted *pro hac vice*)
	250 West 55th Street
	New York, NY 10019
	Telephone: +1 212.836.8344
	kent.yalowitz@arnoldporter.com

	*Attorneys for Petróleos de Venezuela, S.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will deliver the document to all counsel of record.

Dated: June 18, 2020                                  Jason A. Ross