**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-CR-20685-WILLIAMS

**UNITED STATES OF AMERICA**

vs.

**ABRAHAM EDGARDO ORTEGA,**

      **Defendant.**
_____/

**RESPONSE TO PDVSA's SUPPLEMENTAL SUBMISSION**

The United States files this Response with respect to the Supplemental Submission of third-party claimant Petróleos de Venezuela, S.A.'s ("PDVSA"). DE 222. Simply put, PDSVA fails in its attempt to substantially distinguish the cases cited by this Court at the August 10, 2020 telephonic hearing. Once again, PDVSA incorrectly asserts both that PDVSA did not participate in or benefit from the Eaton-Rantor ("ER") scheme and that, to show that PDVSA was complicit in the misconduct, it is insufficient for the government to establish pervasive, constant, and consistent illegal activity by PDVSA officials (*But see*, *In re Instituto Costarricense de Electricidad*, No. 11-12707-G (11th Cir. June 17, 2011) ("ICE"), and *United States v. Baquerizo*, Case No. 1:18-cr-20596-DPG, DE 113 (S.D. Fla. April 1, 2020) ("PetroEcuador" or "PE").

PDVSA's complicity in the ER scheme is one of several grounds, addressed in previous Government submissions, that precludes PDVSA from being recognized as a victim. PDVSA's complicity can be assessed in two ways. First, the extensive involvement of PDVSA officials in misconduct over a long period of time shows that there was an ingrained culture of corruption at PDVSA that permitted misconduct and that precludes it from being recognized as a victim. This is the same type of conduct upon which the Eleventh Circuit relied in holding that the district court

did not err in finding that ICE, an unindicted State-owned entity ("SOE") who was seeking crime victim status, actually functioned as the offenders' co-conspirator.

Second, PDVSA is also responsible for the conduct under *respondeat superior*. To establish liability under this doctrine, the government must show that, in carrying out the ER scheme, PDVSA employees were acting within the scope of their employment and at least in part for the benefit of PDVSA.

Here, the factual proffer identified two PDVSA employees who participated in the ER scheme: Venezuelan Official 1 and Co-conspirator 1. DE 65, Ortega Factual Proffer ¶ 22; 193, 15 n7. Both PDVSA employees acted within the scope of employment in carrying out the ER scheme.[1] Venezuelan law authorized PDVSA to engage in foreign currency exchange transactions with private parties, so long as they used the official government exchange rate. DE 213, Exhibit A at pp. 37-38. Therefore, obtaining and/or approving a loan contract that functioned as a currency exchange would clearly be within the scope of their employment.

These employees were also acting at least in part for the benefit of PDVSA. PDVSA was required to exchange its foreign currency except in limited circumstances. *Id* at 34. As noted, PDVSA was also required to use a specified fixed rate (6.2842 Bolivars = $1.00) in exchanging foreign currency for Bolivars with private parties. *Id*. at 38. PDVSA concedes that the 7.2 billion Bolivar ER loan contract was conducted at the official government foreign currency exchange rate and that PDVSA in fact received 7.2 billion Bolivars. DE 191, 13. As the Eleventh Circuit recently recognized in the PE mandamus orders (DE 202), entering into a contract that was subsequently performed by a qualified contractor was for the benefit of the SOE (even where the employee received a bribe in exchange). As such, PDVSA's employees' actions can be imputed to PDVSA.

---

[1] The United States represents that Venezuelan Official 1 was employed by PDVSA in a finance position and Co-conspirator 1 was employed in a legal position.

Moreover, although the loan contract at issue provided that PDVSA would exchange foreign currency for Bolivars at the fixed rate, the transaction was in fact more favorable to PDVSA. Using the fixed rate, PDVSA was required to pay $1,145,730,562 for 7.2 billion Bolivars. PDVSA, however, was given the right to cancel the debt within 180 days by paying the Euro equivalent of $600 million. DE 65, Ortega Factual Proffer ¶ 16. PDVSA concedes that it exercised this option and cancelled the debt by paying the Euro equivalent of $600 million. DE 191: 4-5, 15. By prepaying the loan, PDVSA effectively doubled its money, benefiting to the tune of approximately $545 million. Contrary to PDVSA's assertions, PDVSA clearly benefited from this transaction.

The cases cited by this Court at the August 10, 2020 telephonic hearing are in accord. PDVSA and the PDVSA officials who participated in the ER scheme are "equally culpable," like the bank and the individual defendants in *United States v. Litos*, 847 F.3d 906, 908, 910 (7th Cir. 2017). And PDVSA's employees' actions clearly benefited the company, as in *United States v. Block*, No. 16-CR-595, 2018 WL 722854, at *3 (S.D.N.Y. Feb. 6, 2018).

        Respectfully submitted,

        ARIANA FAJARDO ORSHAN
        UNITED STATES ATTORNEY

By: s/ Michael B. Nadler
   Michael B. Nadler
   Assistant U. S. Attorney
   Court I.D. No. 51264
   99 Northeast 4th Street
   Miami, Florida 33132-2111
   Tel. (305) 961-9244
   michael.nadler@usdoj.gov

   ROBERT ZINK
   CHIEF, FRAUD SECTION

By: s/ Paul A. Hayden
   Paul A. Hayden
   Trial Attorney
   Department of Justice
   1400 New York Ave., N.W.
   Washington, D.C. 20530
   Tel. (202) 353-9370
   paul.hayden2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by CM/ECF.

                                               s/ Paul A. Hayden
                                               PAUL A. HAYDEN
                                               TRIAL ATTORNEY