UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>18-CR-20685-WILLIAMS(s)</u>

**UNITED STATES OF AMERICA**

vs.

**ABRAHAM EDGARDO ORTEGA,**

    **Defendant.**

_____/

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Abraham Edgardo Ortega is scheduled to be sentenced Wednesday, May 5, 2021, at 2 p.m. The Government respectfully submits this memorandum in connection with that sentencing.

**PRELIMINARY STATEMENT**

The defendant, a sophisticated public servant with a master's degree in business administration, agreed to accept over $15 million in U.S. currency in bribe payments in exchange for the defendant's corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at Petróleos de Venezuela, S.A. ("PDVSA") over a two year period between 2012 and 2014. The defendant then conspired to launder $12 million in U.S. currency of those bribe payments between 2016 and 2017 through accounts in the United States. Such conduct by a high-ranking PDVSA official warrants substantial punishment.

The defendant's Sentencing Guidelines range reflect his serious criminal conduct. For what he did, the Government calculates his advisory Sentencing Guidelines range to be 63 to 78 months of imprisonment. The Government submits that to serve the legitimate purposes of

sentencing, including promotion of respect for the law and deterrence, the Court should impose sentence at the low end of the Sentencing Guidelines range.

## BACKGROUND

The defendant engaged in an international money laundering conspiracy involving two separate schemes over the course of more than a year between 2016 and 2017, in which he laundered $12 million in U.S. currency through accounts in the United States, as more fully described in the defendant's signed Factual Proffer [ECF No. 65].

*Companies C-D Loan Scheme*

In or about 2012, the defendant, Venezuelan Official 1, Subject 4, Subject 5, and Venezuelan Official 5 conspired to execute a corrupt currency exchange scheme involving bribes to PDVSA officials, including the defendant and Venezuelan Official 5 (the Companies C-D Loan Scheme).

As part of this scheme, Company C agreed to loan PDVSA approximately 17.4 billion Venezuelan bolivars in multiple tranches. Under this contract, PDVSA would repay the loan to Company C in U.S. dollars in an amount equivalent to the "loaned" Venezuelan bolivars at the Venezuelan government's fixed exchange rate. After it was determined that Company C was not reputable enough to sign the "loan" contract with PDVSA, Subject 5 found a suitable Venezuelan entity, Company D, to enter into the PDVSA loan contract. Subject 5 then paid Company D $10 million to assign Company D's rights under the "loan" contract to Company C. As part of this scheme, the defendant received $10 million as a bribe payment from Subject 4 to ensure the defendant's cooperation, which would allow PDVSA to repay the "loan" in U.S. dollars in accordance with the contract.

The defendant conspired with co-defendant Gustavo Adolfo Hernandez Frieri ("Hernandez") to launder $7 million of the $10 million that he received as a bribe payment for his participation in the Companies C-D Loan Scheme involving PDVSA. Hernandez directed that this $7 million bribe payment be transferred to U.S. Financial Institution 1 in New Jersey, the custodial bank of Global Securities Trade Finance ("GSTF"). On or about May 26, 2016, at the direction of the defendant and Hernandez, the Confidential Source ("CS") transferred $7 million to account number xxxx5724 at U.S. Financial Institution 1 in the name of GSTF, a Cayman Islands entity, which was a fund that Hernandez controlled as director and through which, in furtherance of the money laundering scheme, he caused shares issued that were exclusively subscribed to by defendant. This $7 million was used to purchase shares in GSTF, which were then held in account/portfolio number xxxx9020 at Banca Zarattini in Switzerland in the name of Big Green Valley SA (a shell company controlled by the defendant).

To justify the transactions that would allow the defendant access to some of the illicit $7 million, Hernandez created fake contracts between a British Virgin Islands company controlled by the defendant, Great Walls FS, and a company controlled by Hernandez. Hernandez also created fake contracts with individuals well-known to the defendant in order to justify transactions that would allow the defendant to access some of the $7 million in bribery proceeds.

*Joint-Venture Schemes*

The defendant also participated in a bribery scheme (the "Joint-Venture Scheme") in which the defendant received a total of $5 million in exchange for acts and decisions in his

official capacity to give both Company A and Company B "priority" status for this type of agreement.

From in or about 2014 through 2015, the defendant, Conspirator 3 (as the representative of Conspirator 1), Subject 1, Subject 2, Subject 3, and Venezuelan Official 4 (a "foreign official" as that term is defined in the Foreign Corrupt Practices Act) attended several meetings in Caracas, Venezuela to discuss accepting bribes from Company A. Conspirator 3 and others conspired to pay the defendant $3 million in exchange for the defendant's decision to give "priority" status for Company A. Specifically, the defendant agreed to accept 3 million U.S. Dollars from Conspirator 3 for the defendant's recommendation to the PDVSA Board of Directors that Company A be given "priority" status.

In or about 2014, the defendant met with co-defendant Francisco Convit Guruceaga ("Convit"), who represented Company B's interests. The defendant and Convit met in a private room in a building in Caracas where they discussed the illegal bribes. The defendant and Convit agreed that Convit would pay the defendant $2 million in exchange for the defendant's decision to give "priority" status for Company B. Specifically, the defendant agreed to accept $2 million from Convit for the defendant's recommendation to the PDVSA Board of Directors that Company B be given "priority" status. Convit told the defendant that Convit would give $2 million to the CS for payment to the defendant. Venezuelan Official 4 also received bribe payments in exchange for facilitating assistance in these schemes.

In order to facilitate the bribe payment to the defendant for the Joint-Venture Scheme, Conspirators 1 and 3 told the CS to assign to the defendant $5 million from Conspirators 1 and 3's share of the 78 million Euros in proceeds from the Eaton-Rantor Loan Scheme. The defendant then conspired with Hernandez to launder $5 million that the defendant received as a bribe payment for his participation in a Joint-Venture Scheme involving PDVSA. On February 21, 2017, Hernandez emailed the CS subscription instructions and a subscription agreement for a new class of GSTF shares. This class was specifically created by Hernandez to receive the defendant's money. On or about February 28, 2017, at the direction of the defendant and Hernandez, the CS transferred approximately $5 million from the CS's account/portfolio number xxxx3311-00 at Deltec Bank & Trust Limited in Nassau, Bahamas (which was an account in which the CS held a portion of the defendant's funds) to account number xxxx6054 at U.S. Financial Institution 1 in New Jersey in the name of GSTF. On March 14, 2017, the $5 million was further transferred to account number xxxx2421 at U.S. Financial Institution 1 in the name of GSTF.

## GOVERNMENT'S ARGUMENT UNDER 18 U.S.C. § 3553(a)

Every one of the relevant factors set forth in 18 U.S.C. § 3553(a) strongly weighs in favor of a term of imprisonment at the low end of the Sentencing Guidelines range.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

First, the nature and circumstances of the offense warrant a sentence at the low end of the Sentencing Guidelines range. The defendant willfully conspired to launder a total of approximately $12 million that he received as bribe payments in exchange for his corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at PDVSA.

The defendant used his various financial positions at PDVSA to enrich himself at the expense of those who placed him in a position of public trust. He then conspired with Hernandez to launder his illicit proceeds. Further, the defendant's criminal activity in this case was not isolated; on the contrary, it extended for over the course of a year. A sophisticated public servant, with a master's degree in business administration, should have rejected the temptation of bribery, instead the defendant placed himself in a pervasive corrupt money laundering conspiracy, triggering his liability.

Second, as to the defendant's personal history and characteristics, there is nothing remarkable about the defendant's age, education, physical or mental capacity, or family circumstances that suggests that he cannot be imprisoned for a term appropriate to his crime. He may argue that he is entitled to leniency because he has no criminal history. While it is true that the defendant has no prior criminal record, he admitted to participating in two separate money laundering schemes over a greater than one-year span; his conduct was not an isolated act.

Simply put, the defendant's personal history and characteristics do not justify a substantial deviation from his Sentencing Guidelines range, a range that is consistent with the nature and circumstances of his offense.

**2. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The defendant's offense was extremely serious. As the U.S. Department of State explained in 2001:

> Money laundering has devastating social consequences and is a threat to national security. It provides the fuel for drug dealers, terrorists, illegal arms dealers, *corrupt public officials* and other criminals to operate and expand their criminal enterprises….

U.S. Department of State, Money Laundering and Financial Crimes Report, *available at* https://2009-2017.state.gov/j/inl/rls/nrcrpt/2000/959.htm (emphasis added).

The sentence should reflect the seriousness of the defendant's offense as well as the threat posed by money laundering more generally.

### 3. The Need for Adequate Deterrence

This factor also weighs in favor of a sentence at the low end of the Sentencing Guideline imprisonment range. It is particularly challenging to investigate and prosecute successfully international money laundering and corruption schemes, especially where, as here, the scheme involves individuals and actions in multiple countries, foreign bank accounts, and other evidence that is located abroad. This means that when such a scheme is uncovered, and a defendant convicted, a substantial sentence is warranted. *See, e.g., United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Thus, the Court should impose a sentence significant enough to deter others from using the U.S. financial system to launder illicit funds. The Court cannot leave the impression that money laundering merits only a few years in jail, or can be outweighed by a defendant's good conduct in other respects.

### 4. To Protect the Public From Further Crimes of the Defendant

The Government submits that this factor is not a central basis for sentencing in this case.

**5. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The Government submits that these factors are not a central basis for sentencing in this case.

**6. The Kinds of Sentences Available**

The Government submits that this factor does not affect the analysis. There can be no serious argument for any sentence other than imprisonment for this defendant who pleaded guilty to conspiracy to commit money laundering.

**7. The Kinds of Sentence and the Sentencing Range**

As discussed above, the defendant's Sentencing Guidelines range is 63 to 78 months' imprisonment. The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Court should impose a sentence of imprisonment, one that falls at the low end of the Sentencing Guidelines range.

**8. Any Pertinent Policy Statement Issued by the Sentencing Commission**

There are no policy statements in the Sentencing Guidelines that justify a substantial variance for the defendant.

**9. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The defendant, like Hernandez who was sentenced last week, falls into the second tier of the categories delineated by the Government for culpability in this case. The defendant is a foreign official who received a bribe and engaged the services of an individual who laundered his illegal proceeds for his own benefit.

He, along with seven other co-defendants, in part, were first charged by complaint [ECF No. 3] and then indicted for their roles in a massive $1.2 billion money laundering conspiracy

involving bribery of PDVSA officials to obtain a loan contract that essentially functioned as a foreign currency exchange contract. [ECF No. 19.] Those indicted in the conspiracy fall into five categories or bands, which include, based on the timing of their respective involvement: (1) two foreign officials (Carmelo Antonio Urdaneta Aqui and the defendant) who agreed to accept bribe payments for their roles in facilitating the currency exchange loan and other contracts and then engaged others to launder their proceeds; (2) one individual (Francisco Convit Guruceaga) who agreed to pay bribes to the two foreign officials in exchange for the loan contract and then laundered his proceeds; (3) three individuals (Gustavo Adolfo Hernandez Frieri ("Hernandez"), Jose Vincente Amparan Croquer ("Amparan"), and Hugo Andre Ramahlo Gois ("Gois")) who agreed to assist in laundering the illegal proceeds obtained as a result of the loan contract and facilitated the laundering of the illegal proceeds; (4) one individual (Marcelo Federico Gutierrez Acosta y Lara) whose bank was used by the defendant in an attempt to launder Ortega's bribery proceeds; and (5) one individual (Mario Enrique Bonilla Vallera) who acted as a strawman for as yet unindicted co-conspirators.

Also charged in the same complaint as those indicted above (along with reference to nine unnamed co-conspirators and three additional Venezuelan officials), but pleading guilty to a separate one count Information charging him with the money laundering conspiracy, was Matthias Krull ("Krull"), a Swiss banker who assisted in facilitating the laundering of the proceeds obtained from the corrupt loan contract. Krull was brought into the conspiracy by Conspirator 7 and his role was to facilitate the laundering of Conspirator 7's illegal proceeds obtained as a result of the corrupt loan contract. This involved Krull introducing Conspirator 7 to other banks and individuals that would launder Conspirator 7's proceeds. [See Case No. 18-CR-20682-CMA, Krull Factual Proffer, ¶¶ 24-25, ECF No. 30.] Krull never actually held or controlled any proceeds from the

9

underlying conduct (forfeiting the $600,000 he received in referral fees) yet was charged and sentenced based on the whole amount of the conspiracy, approximately $1.2 billion. Arguably, Krull falls into a separate category or band of facilitators. This band would include those like Krull who facilitated contact with other money launderers and other co-conspirators. Krull and Hernandez are the only individuals who have been sentenced in the conspiracy to date:

| Name | Case/Judge | Offense | Approximate Bribes Laundered | Guidelines | Sentence | Post-Sentence R-35 Reduction |
|---|---|---|---|---|---|---|
| Matthias Krull | 18-20682 (Altonaga, SDFL) | 18 U.S.C. § 1956(h) with a 1957 object | $1.2 billion ($600,000 forfeiture for referral fee) | 360 months to life, statutorily capped at 120 months | 120 months $600,000 forfeiture (Oct. 29, 2018) | 42 months (Sept. 9, 2020) |
| Gustavo Hernandez Frieri | 18-20685 (Williams SDFL) | 18 U.S.C. § 1956(h) with a 1957 object | $12.3 million ($12.3 million forfeiture) | 97-121 months | 46 months $12.3million forfeiture (April 30, 2021) | N/A |

After the defendant voluntarily self-surrendered to the United States to resolve the criminal charges filed against him, the United States filed a superseding information against the defendant charging him with the money laundering conspiracy with an object of the conspiracy being the engagement in a monetary transaction in criminally derived property with a value over $10,000. [DE 53.] As the crimes charged and the crime to which the defendant pleaded guilty involve money laundering of illicit proceeds obtained from bribes paid to him as a foreign official and others, in part, ranking these categories in order of culpability is not an easy task, as the categories cannot be arranged in a clear hierarchy. This is because money laundering necessarily involves

10

two serious offenses, the laundering as well as the predicate offense (specified unlawful activity) generating the proceeds being laundered. In the view of the Government, based on all of the information and evidence in this criminal case, the most culpable category would be those individuals who masterminded and benefited from the schemes, and who bribed the foreign officials to obtain access to the PDVSA loan contract which allowed them to gain the illegal proceeds, and who also laundered the proceeds for their and other co-conspirators' benefit. The next level of culpability involves the bribe recipients, the money launderers, and the facilitators of the money laundering. Within this level, the participants are nearly equally culpable as they are two sides of the same coin: one involving foreign officials who abused the public trust and accepted a bribe, in this case either to allow access to a loan contract or not to stop the loan contract from being approved; and the other involving those entrusted to move the illegal proceeds so that the bribe recipients and the others who benefited from access to the loan contracts could hide and access their proceeds. The next level would be those connected to the money launderers and others involved in the criminal conspiracy.

      The Government views the defendant as being in the same band or category as Hernandez, yet slightly more culpable as he was a foreign official who took part in a joint-venture schemes in which he took bribe monies, was paid bribe monies from the Companies C-D Loan Scheme, and he used a U.S.- based money launderer, Hernandez, to help him conceal the bribe payments and to provide him access to them. At Hernandez's sentencing hearing on April 30, 2021, the Court stated that in its view the properly calculated sentencing guideline range for Hernandez, 97-121 months, overstated his culpability and that Krull was more culpable than Hernandez. In addition, the Court in sentencing Hernandez stated that it was factoring in his extensive charity work, his impact on minor family friends, and his inability to be forthright with the Government, Probation and the

11

Court concerning his assets and finances. Therefore, the Government assumes, though cannot be certain, that the Court as it began determining the sentence for Hernandez, started his sentencing range at around 60 months of imprisonment. The Government views the defendant as being in the same band or category as Hernandez, yet slightly more culpable as he was a foreign official who took part in a joint-venture schemes in which he took bribe monies, was paid bribe monies from the Company C-D PDVSA loan scheme, and he used a United States based money launderer, Hernandez, to help him conceal the bribe payments and to provide him access to them. As such, the low-end sentencing of the Sentencing Guidelines range of 63 months is a proper starting point for the Court to utilize when fashioning the defendant's sentence and factoring any defense arguments for a § 3553(a) variance.

**10.  The Need to Provide Restitution to Any Victims of the Offense**

The issue on whether a victim exists in this criminal case and restitution is due to them has been fully briefed and is pending before the Court.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court (1) adopt the government's calculation of the defendant's advisory Sentencing Guidelines range, and (2) impose a term of imprisonment at the low end of the applicable Guidelines range of 63 to 78 months' imprisonment, along with a fine, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

| | |
|---|---|
| DANIEL S. KAHN | JUAN ANTONIO GONZALEZ |
| ACTING CHIEF, FRAUD SECTION | ACTING UNITED STATES ATTORNEY |

By:  */s/ Paul A. Hayden*  
     PAUL A. HAYDEN  
     Trial Attorney

By:  */s/ Kurt K. Lunkenheimer*  
     KURT K. LUNKENHEIMER  
     Assistant United States Attorney

<div style="display: flex;">

Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: 202-353-9370
Email: paul.hayden2@usdoj.gov

Court ID No. A5501535
U.S. Attorney's Office - SDFL
99 N.E. 4th Street, Suite 600
Miami, FL 33132-2111
Telephone: (305) 961-9008
Facsimile: (305) 536-4699
Email: Kurt.Lunkenheimer@usdoj.gov

</div>